(79 South. 515)

No. 22740.

STATE v. NEW ORLEANS LAND CO.

(May 27, 1918. Rehearing Denied June 29, 1918.)

*(Syllabus by Editorial Staff.)*

1. PUBLIC LANDS &#9758;106(1)—SCHOOL LANDS—ADJUDICATION BY LAND DEPARTMENT—EFFECT.

As between state and schools, title to fractional section of land, for all purposes of suit by state against claimant of land, must be held to be in schools; Land Department having so adjudicated title, and state not having appealed.

2. RECEIVERS &#9758;142 — SALE OF PROPERTY — TITLE TRANSFERRED.

An adjudication at receiver's sale in suit against a city could transfer only such title to the land as the city had.

3. PUBLIC LANDS &#9758;54(1)—SCHOOL LANDS—TRANSFER.

A private asylum for destitute girls could not transfer land of the state or of the public schools to board of commissioners of a drainage district, created by Act No. 165 of 1858, in payment of any debt it might owe, though the debt was due in part for drainage of the land.

4. STATES &#9758;213—SALE UNDER JUDGMENT.

Sale of state's land under judgment against private asylum for destitute girls would be a nullity.

5. DRAINS &#9758;15 — TERRITORY INCLUDED — STATE SCHOOL LANDS—STATUTE.

Land of the state, and land held by it as trustee for the public schools, was not intended to be embraced in Act No. 165 of 1858, as to formation of drainage districts, authorizing proceeding in rem without other citation than newspaper publication.

6. TAXATION &#9758;183 — EXCEPTION OF STATE PROPERTY.

State property is impliedly excepted when authority is given to levy a tax.

7. ESTOPPEL &#9758;62(2) — ESTOPPEL AGAINST STATE—ACTS OF DRAINAGE BOARD.

Acts of drainage board created by Act No. 165 of 1858, in acquiring state land from private orphan asylum, and transferring it to city of New Orleans, were not binding by estoppel on the state; board being mere local agency.

8. ESTOPPEL &#9758;62(2)—RATIFICATION OR CONFIRMATION—STATUTE.

Under Civ. Code, art. 2272, providing that the act of confirmation or ratification of obligation against which law admits action of nullity or rescission is valid only when containing the substance of the obligation, mention of the mo-

tive of the action of rescission, and the intention of supplying the defect on which it is founded, an estoppel cannot be based on a legislative act which does not contain such matter.

9. ESTOPPEL ☞70(1)—TITLE TO LAND.

In the absence of assumption of responsibility for, or misrepresentation of, the title of land conveyed, there can be no ground for estoppel in that respect.

10. PUBLIC LANDS ☞54(2) — ALIENATION — LAND NOT BELONGING TO STATE—DEED OR ESTOPPEL.

Land not awarded as school land by the Land Department did not belong to the state and was not subject to be alienated by it, by direct deed or through the medium of an estoppel.

11. SCHOOLS AND SCHOOL DISTRICTS ☞15 —SCHOOL LANDS — STATE AS TRUSTEE—DIVERSION OF LAND.

The state, holding land as trustee for schools, could not divert it from its trust purpose, and transfer it to a drainage board for drainage purposes, either by direct act of donation, or through the medium of an estoppel.

12. ADVERSE POSSESSION ☞7(2) — PRESCRIPTION AS AGAINST STATE.

Prescription acquirandi causa does not run against the state for its own property.

13. ADVERSE POSSESSION ☞7(2)—PRESCRIPTION—SCHOOL LANDS OF STATE.

Prescription acquirandi causa does not run against the state for school land, conditional title to which was given the state by Act Cong. Feb. 15, 1843.

14. ADVERSE POSSESSION ☞43(1)—PRESCRIPTION—SUCCESSIVE OCCUPANTS.

Successive titularies of land, confident in the security of their title for more than 150 years, should not be disturbed unless the legal situation compels it.

15. PUBLIC LANDS ☞210—SPANISH GRANT—PRESUMPTION.

Actual occupancy, for more than 30 years during Spanish régime, of land now within limits of New Orleans, then within mile of limits, brought to public attention by two notarial transfers at time, may be considered to have had the tacit, if not the express, confirmation of the Spanish régime.

16. PUBLIC LANDS ☞195 — COLONIAL LAND GRANTS—CONFIRMATION ACTS.

The Acts of Congress providing for the confirmation and registry of colonial land grants refer only to inchoate titles, not to those which had matured before transfer of the colony to the United States.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Suit by the State of Louisiana against the New Orleans Land Company. Judgment for plaintiff, and defendant appeals. Judgment set aside in part, and affirmed in part.

Chas. Louque and W. O. Hart, both of New Orleans, for appellant. Chandler C. Luzenberg, Dist. Atty., of New Orleans, L. Robert Rivarde, Dist. Atty., of Gretna, and I. D. Moore, City Atty., of New Orleans (Wm. Winans Wall and J. C. Henriques, both of New Orleans, of counsel), for the State.

PROVOSTY, J. The board of directors of the public schools of the parish of Orleans brought suit against the defendant company to recover fractional section 16, township 12, range 11 east, as belonging to the public schools of said parish, and obtained judgment in the trial court and in this court; but, on application for a rehearing, the judgments were set aside, for the reason that it was found that the proper authority for standing in judgment as plaintiff in the suit was the state, and not the school board. Board of Directors of Public Schools of Parish of Orleans v. New Orleans Land Co., 138 La. 32, 70 South. 27. The present suit is a renewal of that suit, and has been brought by authority conferred by Act 158, p. 237, of 1910, in the interest of the public schools of the parishes of Orleans and Jefferson.

We are asked by defendant to consider again the points involved, and will do so.

The answer contains the following allegation:

"That a small portion of the property claimed in this case was acquired from Bernard Maylie, who acquired same at a tax sale for delinquent taxes assessed to the Milne Asylum for Destitute Orphan Girls, which tax sale was made more than three years before the institution of this suit, and for more than three years defendant has been in possession of the property as owner and has been paying taxes thereon."

The portion thus said to have been acquired is not further described than is here stated,

either in the petition or in the evidence; the tax deed was not offered in evidence; and this tax title is not referred to in the briefs. So that we assume the defendant is no longer relying upon this alleged tax sale for any purpose.

Defendant claims to have title under a grant made by the French or Spanish government in colonial days; and, in the event this title is not recognized, and the land is held to have belonged to the state of Louisiana, or to the public schools, then, under an adjudication made to its author in title at a receiver's sale in the suit of J. W. Peake v. City of New Orleans; and if not by virtue of the foregoing, then by prescription of 30 and 10 years; and claims, finally, that, at all events, the land cannot possibly belong to the schools, because the section and the township are both fractional, and hence that the suit must be dismissed, since the action, being petitory, comes under the principle that the plaintiff in a petitory action must recover on the strength of his own title and not on the weakness of that of his adversary. Defendant also pleads estoppel.

[1] The said township was surveyed officially, and the survey approved, in 1872. Part of its area being swamp, and therefore passing to the state by virtue of the congressional land grants of 1849 and 1850, the state applied to the Land Department to have her title under said grants confirmed. This was in 1896. The confirmation was accorded, except as to this section 16, which the department ruled was school land, and hence not to have passed under said land grants. In that decision the state has apparently acquiesced; for she did not appeal from it then, and has not done so to this day after more than 20 years. The correctness of that decision, which the state, the only party in interest, is thus not contesting, we do not see that the defendant in this case has any standing for contesting. In this respect the case is analogous to those where the former owner of property adjudicated to the state at tax sale has been held to be without interest to inquire into the validity or nullity of a sale made of the same property by the officers of the state to some third person, without authority. Quaker Realty Co. v. Labasse, 131 La. 996, 60 South. 661, Ann. Cas. 1914A, 1073, and cases there cited. Rightly, or wrongly, therefore, as an effect of the said decision of the Land Department, the title, as between the state and the schools, must, for all the purposes of the present suit, be held to be in the schools.

The title by colonial grant we shall come to later. We take up now the question of whether the title of the state, individually or as trustee for the schools, was transferred to plaintiff's author in title by the adjudication at the receiver's sale in the suit of J. W. Peake v. City of New Orleans.

This point has already been decided against defendant in the cases of Leader Realty Co. v. Lakeview Land Co., 133 La. 646, 63 South. 253; Board of Directors v. New Orleans Land Co., 138 La. 32, 70 South. 27; Leader Realty Co. v. New Orleans Land Co., 142 La. 169, 76 South. 601.

[2] Said adjudication could transfer, of course, only such title as the city had.

If she had any, it was derived through a sale made by the Milne Asylum for Destitute Orphan Girls to the board of commissioners of the drainage district created by Act 165, p. 114, of 1858; and under Act 30, p. 75, of 1871, transferring to the city, as trustee, all the real estate the said board might have title to. The asylum could, of course, transfer only such title as it had, and as to what title it had will be shown when we come to consider the alleged colonial grant.

[3] The learned counsel for defendant think that the title thus transferred by the asylum became perfected in some way in the course of, or as an effect of, the transfer to the

drainage board; because the transfer was made to satisfy a debt due by the asylum to said board under this same act of 1858 for the drainage of this and of other lands of the asylum. To our mind it is very plain that the asylum could not transfer the land of the state or of the public schools in payment of any debt it might owe, and that the fact that the debt was due in part for the drainage of this land could not make any difference.

[4] Counsel deal with the case as if a judgment had been obtained against the asylum for the assessment under said act, and the property had been seized and sold under said judgment, and adjudicated to the said drainage board. Such is not the case. But we do not see that it would make any difference if it were, for a sale of the property of the state made under a judgment against this asylum would be simply a nullity.

[5] A vague argument is made that this land, even though belonging to the state or to the schools, was liable to the drainage assessment under said act; and that therefore the title of the said drainage board to it was good. And, in support of this, the decision in New Orleans v. Warner, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96, is cited, where, speaking of the said act of 1858 and its several amendments, the Supreme Court of the United States said:

"There is nothing in the several statutes of Louisiana upon the subject which indicates that private property only was intended to be affected. It is true that by the act of 1858, par. 7, the district court is empowered to decree that each portion of the property situated within the drainage limits is subject to a first mortgage, lien and privilege in favor of the board of commissioners for such amount as should be assessed upon such property for its proportion of the cost of the draining; and that this was obviously intended not to apply to public property."

The said act of 1858 did not authorize a proceeding in personam for enforcement of payment of the drainage assessment which it authorized to be levied, but only a proceeding in rem, without other citation than newspaper publication—very much after the manner in which the payment of state taxes is enforced. It is hardly possible that, by such a proceeding, the streets and public places of the city of New Orleans could have been seized and sold as private property. It may be doubtful, therefore, and we say it with all due deference, whether property of that kind was intended to be subjected to said local contribution. But however the case might stand as to that kind of property, we are very clear that the state's property and the property held by the state as trustee for the schools was not intended to be embraced in said act; for it is very evident, from the reading as a whole, that the state did not contemplate that she should be one of the "owners" of property to be proceeded against in the summary method provided for in said act; and it is very evident that the $81,000 appropriation made by the state in said act towards the expense of said drainage was with a view to an equitable contribution by the state because of whatever state property might be situated within the area to be drained.

The Supreme Court of the United States in this Warner Case, even though holding that the city's property was within the act, was of opinion that obviously the city's property was not to be affected by any mortgage, lien, or privilege, or, in other words, was not to be liable to be seized and sold. Now, if this was true of the city's property, how much truer was it of the state's property, or of the property of the schools held in trust by the state. This state property could not have been seized and sold under said act of 1858, and still less could it be transferred by the asylum or by any other stranger to the title.

[6] The statute authorizing this drainage assessment to be levied made no mention of the state's property or of the property held

by the state as trustee for the public schools, and "the rule is that state property is impliedly excepted when authority is given to levy a tax." Leader Realty Co. v. Lakeview Land Co., supra. See, also, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96, note.

Passing to defendant's plea of estoppel, we note that the reason urged in the brief why the state should be held to be estopped is different from that pleaded in the answer. In the answer it is that the drainage board was an agency of the state, and that therefore its acts, in acquiring this property from the Milne Asylum for Destitute Orphan Girls and transferring it to the city of New Orleans, are binding upon the state. In the brief, the argument is that Milne having by his testament bequeathed this and other lands to the Milne Asylum for Destitute Orphan Girls, and the state having by special acts (Acts 3 and 4 of 1839) chartered this asylum and authorized it to accept said bequest, recognized and ratified thereby Milne's, or the asylum's, title to this land; and, again, that the state, having by special act (Act 30 of 1871) directed the drainage board to transfer all its paraphernalia and belongings to the city of New Orleans to be held by the city in trust for the purpose of continuing the drainage work through the instrumentality of the Mississippi & Gulf Ship Canal Company, recognized and ratified thereby the title of the drainage board to this land which the board had acquired by private dation en paiement from the asylum in satisfaction of the asylum's debt for the drainage assessment upon this and its other lands.

[7] The estoppel as pleaded in the answer is not urged in the briefs. It is without merit, since the drainage board was a mere local agency, and in no sense a state agency empowered to alienate the lands of the state by estoppel or otherwise.

[8] The estoppel as argued in the briefs has more plausibility, since it is sought to be

143 LA.—28

founded upon acts of the Legislature; but in reality it is equally without merit. The said statutes cannot be said to have been confirmations or ratifications of anything, because, by express provision of Civ. Code, art. 2272:

"The act of confirmation or ratification of an obligation, against which the law admits the action of nullity or rescission, is valid only when it contains the substance of that obligation, the mention of the motive of the action of rescission, and the intention of supplying the defect upon which that action is founded."

[9] The said legislative acts did not purport to do any of these things, and did not purport to donate or otherwise alienate this land. Therefore, not having been ratifications nor alienations, they can serve as ground for estoppel only if they were representations upon which others had acted. But, before the Legislature can be charged with misrepresentation regarding the title of Milne or of the drainage board to this land, the fact would have to appear that the Legislature had knowledge of this land being included among those which Milne or the drainage board claimed to have title to; and that fact does not appear. The sole object of the statute incorporating the Milne Asylum and authorizing it to accept the Milne bequest was to carry out these purposes; and, in like manner, the sole object of the statute directing the drainage board to transfer its holdings to the city of New Orleans was to carry out that purpose. In neither of these cases was the Legislature called upon to investigate, or to know anything about, the titles to the property involved. The property was to pass just as it was, the state not assuming any responsibility whatsoever in the premises, and making no representations whatsoever; and, in the absence of either assumption of responsibility or misrepresentation, there can be no ground for estoppel. If the purchaser at the receiver's sale was misled by these acts into believing that the purpose or effect of these acts was to represent that the title of the

drainage board to this school land was good, it was because he found in these acts something not in them. But we dare say the truth of the matter is that this purchaser made his purchase without having ever heard of these old acts of the Legislature, and still less 'having read tnem; and therefore was in no way misled by them.

[10, 11] But if it were assumed that he was misled, the estoppel would have no better foundation; for, until the decision of the Land Department awarding this land to the schools and rejecting the claim of the state to it shall have been set aside, the land must be held never to have belonged to the state, and hence to have never been subject to be alienated by her, either by direct deed or through the medium of an estoppel, as land belonging to her. And, of course, holding this land as trustee of the schools, she could not divert it from the schools, its trust purposes, and transfer it to the drainage board for drainage purposes; it could no more do that through the medium of an estoppel than by direct act of donation. What one cannot do directly, one cannot do indirectly.

[12, 13] There is also something said about prescription having accrued as against the state and the schools. Prescription acquirendi causa does not run against the state for her own property. State v. Buck, 46 La. Ann. 667, 15 South. 531; 17 R. C. L. 689. Still less could it be allowed to run against the state for school land. Inherent in the state's title to such school land is a condition imposed by the act of Congress (Act Feb. 15, 1843, c. 33, 5 Stat. at L. p. 600) that the state cannot alienate same without the consent of the inhabitants of the township in which the land is situated. If, then, the state cannot alienate same by express statute to that effect without such consent, she is in no better position to do so by her laws of prescription acquirendi causa. The decisions cited by defendant's learned counsel have reference to school lands in Alabama not coming under the provision of said statute.

We pass now to the consideration of the colonial grant.

In a deed executed before Andres Almonester, notary public, on July 3, 1773, Carlos Terrascon sells to Andres Jung the following:

"A plantation situated one league from this city on Bayou St. John, composed of eight arpents of ground on the front with the ordinary depth of forty, bounded on one side by another plantation of C. Bartholome and on the other side by another plantation belonging to Don Antonio Maxent."

This act contains the following declaration:

"The same is held by me by concession made to me by Mr. Aubry, French Governor, at the time of his domination, before Stan. Foucault, Commissary, as appears in the titles that he delivered to the purchaser."

And the purchaser declared:

"I accept in my favor this instrument and through it, as purchaser, the eight arpents of ground referred to, which are delivered to me to my satisfaction, but I renounce the proofs and laws of its delivery, that of the house not seen nor received, and all of such that I might give a receipt in form for."

Aubry was acting governor of the province of Louisiana from the death of D'Abadie in 1763 to the taking possession of the province by O'Rielly for Spain in 1769.

On March 8, 1774, the year following the sale by Carlos Terrascon to Don Andres Jung, the latter executed an act of sale before the same notary selling the same plantation by the same description to Mariana, free woman of color; and this purchaser acknowledged delivery of the plantation "as well as of the house, not seen or received."

Three years later, May 14, 1777, Mariana sold the same plantation to Naneta, free woman of color, as also "two cows and four calves which are situated on said plantation."

Five years later, in 1782, Naneta made her notarial will bequeathing her property to her husband Michel Deruisseaux.

Six years later, on May 25, 1788, Michel De-

ruisseaux, by notarial act, sold 4 arpents front by 40 arpents in depth of the land to James Profit and Thomas and David Urquhart.

The four arpents thus acquired by them, Profit and the Urquharts subsequently sold to Alexander Milne.

On May 20, 1804, Michel Deruisseaux sold 2 arpents by 40, bounded on one side by the land of Profit and Thomas and David Urquhart, and on the other side by his own land to Alexander Milne.

On January 25, 1804, by notarial act, Michel Deruisseaux made his will instituting his wife, Marie Noyant, his universal legatee.

On December 1, 1829, the remaining two arpents front of the original 8 arpents front was adjudicated to one Ferry at the succession sale of Marie Noyant, and shortly thereafter Ferry sold same to Alexander Milne; thus reuniting the 8 arpents front in the hands of Alexander Milne.

Milne bequeathed the property to the Milne Asylum, then not in existence, but which was subsequently incorporated by special act of the Legislature, as already stated.

The asylum, by private sale, transferred the land to the drainage board in satisfaction of the drainage assessment due by it on this and other lands, as already stated.

The drainage board, in obedience to the said act of the Legislature directing it to transfer to the city of New Orleans, in trust for prosecuting the work of drainage, all its paraphernalia and belongings, transferred this and its other lands in globo to the city; and, as already stated, these lands were sold at a receiver's sale, in the matter of Peake v. City of New Orleans, and acquired by the defendant's author in title.

The defendant has been unable to produce either the original or a copy of the document evidencing the grant to Carlos Terrascon; but accounts for the absence of the document itself and of its registry by calling attention to the fact that the records of the registry of the deeds of that time, as well as all archives relating to land grants, were destroyed by fire in 1788, a fact established by a letter of Thomas Jefferson to Congress of date November 3, 1803 (Am. State Papers, vol. 1, Miscellaneous, Ed. of Gales and Seaton, p. 351, No. 164 of Lands and Titles), and by the following statement in Landry v. Martin, 15 La. 9 (decided in 1840):

"The archives of the province were partially destroyed in the conflagration of New Orleans, in 1788, and whatever escaped from the flames was carried away on the transfer of the province."

In this same case, the court said:

"After long and continued possession of land, for nearly half a century" (in the case at bar 150 years), "if a written grant were necessary, the testimony of witnesses, after the loss of the archives and titles, will authorize the court to presume it."

The testimony of witnesses in the instant case is lacking; but its absence is supplied, we think, by the recital in this Terrascon deed, made at a time unsuspicious, and supported by the evidence of the "titles" (either the original document itself or some duly authenticated copy of it) which the deed recites was then and there "delivered by the seller to the purchaser."

As for the possession, the rear part of the land (the part involved in this suit), consisting as it does of swamp, has, of course, never been in any one's actual possession; but the recitals in the deeds, that what was sold was a plantation, a "habitation," indicates unmistakably that the front part was actually occupied. There was evidently a house upon the land, and from the description it is evident that the lands on each side were also "plantations."

[14] There can be no doubt at all that the successive titularies of this land for more than 150 years have been confident in the security of their title. They should not be

disturbed at this late day, unless the legal situation absolutely compels it.

Plaintiff contends that Acting Governor Aubry was without authority to make grants of land, and that the Supreme Court of the United States has so held in the case of U. S. v. D'Auterive, 10 How. 609, 13 L. Ed. 560. That is true, but in the later cases of Pillerin et al. v. United States, 13 How. 9, 14 L. Ed. 28, the same court said of like grants:

"In some of these cases evidence has been offered of continued possession by the grantees of those claiming under them, ever since the grants were made. But if there has been such continued possession, and acts of ownership over the land as would lay the foundation for presuming a confirmation by Spain of these grants, or of either of them or of any portion of either of them, such confirmation would amount to an absolute title, and not an inchoate or imperfect one."

In U. S. v. Chavez, 175 U. S. 509, 20 Sup. Ct. 159, 44 L. Ed. 255, the court said:

"Upon a long and uninterrupted possession of lands in Mexico, beginning long prior to the transfer of the territory in which they are situated to the United States, and continuing after that transfer, the law bases presumptions as sufficient for legal judgment, in favor of the possessor, in the absence of rebutting circumstances, which do not exist in this case."

In Mitchel v. U. S., 9 Pet. 760, 9 L. Ed. 283, the court said:

"If there could be a doubt that the evidence in the record did not establish the fact of a royal license, or assent to this purchase, as a matter of specific and judicial belief, it would be presumed as a matter of law arising from the facts and circumstances of the case, which are admitted or unquestioned."

In Strother v. Lucas, 12 Pet. 411, 9 L. Ed. 1137, the court said:

"The unwritten law of Louisiana, before the cession of the territory to the United States, in favor of long possession and ancient appropriation, everything which was done will be presumed to have been rightfully done, and, though it does not appear to have been done, the law will presume that whatever was necessary has been done."

[15] We think that by application of these principles defendant is entitled to be quieted.

An actual occupancy which thus existed for more than 30 years, during the Spanish régime, of land well within what are now the city limits and within about one mile of what were then the city limits, and further brought to public attention by two notarial transfers made during that time, may well be considered to have had the tacit, if not express, confirmation of the Spanish authorities.

Under the Spanish law, a possession of 30 years, even unaccompanied by title of any kind, would mature into title. White's New Recopilation, vol. 2, p. 734.

It was the policy of the Spanish government not to oust those who had possessed for 10 years even though without title of any kind, but only to require of them, "a moderate retribution." White's New Recopilation, vol. 2, p. 239, art. 20.

In Devall v. Choppin, 15 La. 575, this court said:

"It is historically known that the Spanish government never contested the validity of the grants made by the French officers before the Spaniards took possession of the colony; that the conduct of Spain amounts to at least a tacit ratification."

[16] The objection made by plaintiff, that defendant or its authors in title never took advantage of the acts of congress providing for the confirmation and registry of colonial land grants, is inapplicable to the case, as said laws have reference only to titles inchoate, and therefore needing confirmation; not to titles which (as we hold the one involved in this case to be) had matured and become perfect before the transfer of the colony to the United States. Pillerin v. U. S., cited supra.

The said colonial grant and the titles following it extend, however, no further back than 40 arpents from Bayou St. John, and therefore embrace only a part of the land in dispute. As to the remainder, the defendant has no title, and has no standing for contest-

ing in any way the title of the schools. To the extent of this remainder, therefore, the plaintiff is entitled to recover.

We have no apologies to make for having taken a different view of the title of defendant derived through this colonial grant when this case was here before, especially after fuller light has been thrown upon the matter on this second trial. Cases involving these old titles are exceedingly complicated, and perplexing to courts, or nonexperts in such matters, as witness the Supreme Court of the United States saying in the cases of Soulard v. U. S., 4 Pet. 511, 7 L. Ed. 938, involving such a title, that they had kept the case under advisement from the preceding terms, and would again keep it under advisement for another term, for the reason that:

"After bestowing upon them the most deliberate attention, we are unable to form a judgment which would be satisfactory to ourselves, or which ought to satisfy the public."

The land involved in the case of Leader Realty Co. v. Lakeview Land Co., and Leader Realty Co. v. N. O. Land Co., 142 La. 169, 76 South. 601, lay back of the 40-arpent line, and hence the decision in that case does not conflict on the facts with the present decision. And what was there said touching the colonial grant to Carlos Terrascon was founded entirely upon what had been found by the court in the case of Board of School Directors v. N. O. Land Co., 138 La. 32, 70 South. 27, as to which, as just said, we do not feel that we have any apologies to make. We can only decide cases as we see them: if upon a retrial they appear to us in a different light, we can but decide them as seen in this different light.

The judgment appealed from is therefore set aside in so far as it embraces any part of the land included within the 40-arpent line from Bayou St. John, or in so far as it includes any part of the land covered by the colonial grant to Carlos Terrascon and the titles founded on it; and as to that part of the land the suit of plaintiff is dismissed; and the said judgment is otherwise affirmed. The plaintiff to pay the costs of appeal.

O'NIELL, J., concurs in the decree.