(87 South. 302)

No. 24004.

**STATE v. BOWIE LUMBER CO. (RIVES et al., Warrantors).**

(Jan. 3, 1921. Rehearing Denied Jan. 31, 1921.)

*(Syllabus by Editorial Staff.)*

1. **Public lands** ☞211—Act relinquishing state's title to grantee from French government was not void as disposing of school lands.

Acts 1855, No. 114, for the relief of A. B. Roman, adopted pursuant to Act Cong. July 17, 1854, relinquishing to said Roman, his heirs and assigns, all right, title, and interest of the state to lands privately granted June 25, 1765, by the French government, to one Nicholas Verret, Roman's predecessor, *held* not ineffectual on the ground that, if the Verret grant had not been approved, a sixteenth section would fall in place in the township which would be held by the state, not as owner, but as the trustee for the inhabitants of the township, while the state cannot dispose of such sixteenth section except as authorized by Acts 1855, No. 321, providing the manner of sale of sixteenth sections under authority of Act Cong. Feb. 15, 1843, when authorizing the Legislature to provide for the sale of lands reserved for school purposes.

2. **Public lands** ☞211—Confirmation of foreign grant by act of Congress not ineffectual on account of proviso.

Confirmation by Act Cong. July 17, 1854, of private land grant made on June 25, 1765, by the French government to one Nicholas Verret, from whom defendant claims title by mesne conveyances, *held* not without effect because of the proviso the act should not impair the bona fide rights, interests, or claims acquired by any other person under adverse claims, concessions, or purchases made prior to the passage of the act.

3. **Public lands** ☞209—Failure to present claim to land office within two years of passage of act of Congress not abandonment or forfeiture.

Failure of successor of grantee under private land grant made June 25, 1765, by the French government to one Nicholas Verret, to present his claim to the register and receiver of the Land Office for registry and approval, within two years after the passage of the Act Cong. Feb. 6, 1835, *held* not abandonment or forfeiture of his claim to the land.

4. **Public lands** ☞204—Description of foreign land grant sufficient though not locating near boundary.

Description in private land grant made June 25, 1765, by the French government to one Nicholas Verret *held* sufficient to identify the land, though lacking in the location of the rear boundary, it reading "sur toute la profondeur qui pourra s'y trouver," meaning "with all the depth that may be found," which is interpreted as extending the side lines back to the nearest watercourse in the rear.

Provosty, J., dissenting in part.

Appeal from Twenty-Seventh Judicial District Court, Parish of St. James; Philip H. Gilbert, Judge.

Suit by the State of Louisiana against the Bowie Lumber Company in which J. C. Rives and others were called in warranty. From a judgment for plaintiff, defendant and certain warrantors appeal. Judgment annulled, and suit dismissed.

Hall, Monroe & Lemann, of New Orleans, for appellant Lumber Co.

Milling, Godchaux, Saal & Milling, of New Orleans, for other appellants.

W. B. Le Bourgeois, of New Orleans, and Purser & Magruder, of Amite, for the State.

O'NIELL, J. The state sued to recover 640 acres of land alleged to be a sixteenth section, in place, in township 13 south, range 16 east, in the southeastern land district, and to recover $26,720.92 as the value of timber alleged to have been taken from the land by

defendant. Defendant answered that there never was a sixteenth section in township 13 south, range 16 east, in the Southeastern land district, and alleged that the area of 640 acres which would form the sixteenth section if there were one in place in that township was embraced within a private land grant made on the 25th of June, 1765, by the French government to one Nicholas Verret from whom defendant claimed title by mesne conveyances set forth in the answer to this suit. Defendant averred that, although the grant made by the French authorities to Nicholas Verret was made 14 months after the Treaty of Cession of the Louisiana Territory from France to Spain the grant was thereafter recognized and tacitly confirmed by the Spanish authorities in various ways set forth in the answer, and that, by such recognition and tacit confirmation on the part of the Spanish government, the grant became an absolute, perfect, and complete title, which was protected by the Treaty of Cession, independent of any legislation by the Congress of the United States, and did not need any proceeding in a court of the United States to give it validity or effect. Defendant averred that the completeness and validity of the grant in that respect was adjudged by the Supreme Court of the United States in a suit brought by A. B. Roman, who held title under Nicholas Verret, and who was one of the authors in title of defendant herein; and defendant therefore pleaded as res adjudicata the decision of the Supreme Court of the United States rendered in 1851 in the suit entitled United States v. Roman, reported in 13 How. 9, 14 L. Ed. 28. Defendant averred that the validity of the grant to Nicholas Verret was on the 10th of June, 1854, investigated by the congressional committee on private land claims, and that the committee found and reported the grant valid; that, pursuant to the finding and recommendation of the aforesaid committee on private land claims, the Congress of the United States enacted a statute, the act approved July 17, 1854 (10 Stat. 785), recognizing and confirming the original grant made to Nicholas Verret in 1765 and the title of A. B. Roman emanating from said grant, and authorizing the issuance of a patent for the land; and that, in due course, a patent was issued by the United States to A. B. Roman for the land described in the grant to Nicholas Verret. Defendant averred that on the 12th of March, 1855, the state of Louisiana enacted a statute, Act No. 114 of 1855 (page 120), forever relinquishing in favor of A. B. Roman, his heirs and assigns, all the right, title, or interest that the state had in or to the land described in the claim of Nicholas Verret, and described in the statute, as "eighteen arpents front on the right bank of the Mississippi river and running back to the stream or bayou called 'Jeetaman,' in the parish of St. James, being part of a French grant made to Nicholas Verret in 1765." Defendant averred that the defendant company and each of its authors in title had bought the land at great expense, having good faith and confidence in the validity of the grant to Nicholas Verret, in the protection afforded by the treaty of the United States with France, in the recognition by the congressional committee and the act of Congress aforesaid, and in the statute of this state relinquishing in favor of A. B. Roman, his heirs and assigns, whatever claim the state had to the land; and defendant averred that the company and its authors in title had been in actual possession of the land continuously for a period exceeding 150 years preceding the institution of this suit. Defendant therefore pleaded that the state of Louisiana was estopped from contesting the title which defendant had acquired through mesne conveyances from A. B. Roman.

On the issues thus presented the case was tried, and judgment was rendered in favor of

plaintiff declaring the state to be the owner of the land, and condemning defendant to pay $6,680.23 as the value of the timber taken from the land. Defendant has appealed; and plaintiff, answering the appeal, prays that the judgment for the value of the timber be increased to the amount sued for.

### Opinion.

The state cannot successfully claim a sixteenth section, or school section, in this township, if the Nicholas Verret grant was a complete grant when the United States acquired the Louisiana Territory, or if the claim of Nicholas Verret was thereafter made valid by the act of Congress confirming the grant and the statute of this state relinquishing the state's claim. Defendant has produced a complete chain of title emanating from Nicholas Verret, viz.: The heirs of Nicholas Verret sold to Michel Cantrelle on the 24th of January, 1788. The succession of Cantrelle sold to Victorian Roman, on the 26th of January, 1816. Victorian Roman sold a half interest in the land to A. B. Roman on the 18th of May, 1816, and sold the remaining half interest to the widow of Jacque Roman on the 22d of December, 1826, and she sold that half interest to A. B. Roman on the 29th of June, 1835. A. B. Roman mortgaged the land to the Citizens' Bank of Louisiana, and in foreclosure of the mortgage the sheriff seized the land and sold it to the Citizens' Bank on the 30th of April, 1867. The bank sold to Charles and Alfred Roman on the 15th of May, 1867, and reserved a mortgage on the property. It was afterwards seized by the sheriff and sold to the bank again on the 4th of January, 1875, in foreclosure of the mortgage. The bank sold to the New Orleans Pacific Railway Company on the 12th of April, 1881, reserving a mortgage on the property. In foreclosure of the mortgage the land was again seized by the sheriff and sold to the

bank on the 5th of June, 1886. The bank sold to the Roger & Balintine Company, Limited, on the 17th of April, 1891. The company sold to Robert W. Roger on the 19th of June, 1891; and he sold to the St. James Timber Company, Limited, on the same day. The St. James Timber Company sold to the Reeves & Brogan Shingle Company, Limited, on the 19th of May, 1902. The name of the shingle company having been, by amendment of its charter, changed to that of J. C. Reeves Cypress Company, Limited, the latter sold the land to the defendant herein on the 23d of July, 1912. All of the deeds were duly recorded; and all except three of the deeds contained a warranty of title and subrogation to all rights and actions of warranty.

The original grant to Nicholas Verret is in the French language. There appears to have been recorded in the New Orleans land office, some time prior to the 23d of February, 1837, the original instrument, as well as an English translation. The record contains a copy of the French text certified by the register of the New Orleans land office on the 23d of February, 1837, and a copy of the English translation certified by the register as a true and correct copy on the 14th of November, 1854. The translation is as follows:

Cabanece:

Pursuant to the petition hereto annexed of Nicholas Verret. and in view to facilitate the establishment which he wishes to form for. his seven children, we have granted, and do hereby grant by these presents to him, twenty arpents front with all the depth that may be found, on a tract of land adjoining and below the one he now occupies, situated on the River St. Louis or Mississippi, at the place called Cabanece, above and on the other side of New Orleans, so that his heirs or assigns may hold and possess in full and usufruct as a property belonging to them, safe, prior titles or possession contrary to this, under conditions that within one year of this date he will cause them to be valuable yield, in default of which, and said term having expired, they will be replaced in

the domain of the king, who will dispose of them as, if this grant had never been made, and also under condition to pay the seigneurial rights, if any were hereafter established in this province. We shall, in the same manner, receive in the name of his majesty all and in particular the necessary timber for the construction of forts, stores, and other works which are or· may hereafter be ordered by his majesty and even for repairs of his vessels whenever required, as well as the necessary land for construction and fortifications.

Respecting the courses which must limit twenty arpents front, they will be established by posts planted to that effect, for which a procès verbal shall be made and annexed to these presents after they shall have been duly registered on our register of concessions.

Given at New Orleans under our seal of arms and the countersignatures of our secretaries this 25th of June, 1765.

[Signed] Aubry & Foucault.
[Countersigned] Soubre & Duverge.
Charles Phillipe Aubry.
Denis Nicholas Foucault.

Land Office, New Orleans, Nov. 14, 1854.

I hereby certify the foregoing to be a true copy of the original taken from the records of this office.

Witness my hand at the time and place above written.

[Signed] Louis Palms, Register.

The only defect in the grant is that it was made by the French authorities subsequent to the Treaty of Cession of the Louisiana Territory from France to Spain, which was made on the 21st of April, 1764. Far from being contested, however, by the Spanish authorities, the grant was recognized by them in several ways. The ancient records disclose that the front part of the land, on the Mississippi river, was occupied by Nicholas Verret, and in turn by his heirs, until it was sold to Michel Cantrelle in 1788. Verret and Cantrelle were both Spanish officers. The record also discloses that on the 27th of December, 1773, the Spanish government granted to one Joseph Hebert six arpents front on the river, measured from the south boundary of the Nicholas Verret grant, and described the land as "adjoining the planta-

tion of Nicholas Verret above." The grant to Joseph Hebert is a part of the nine arpents fronting on the river afterwards acquired by A. B. Roman, referred to in the act of Congress of July 17, 1854, and in Act No. 114 of 1855 of the Legislature of this state, as "9 arpents and 6 toises front; the said last-described tract consisting of two complete grants made by the Spanish government to Joseph Hebert and Jean Baptiste Cormie on the 27th of September, 1773." It also appears from the testimony of the witnesses in the suit of Roman against the United States that Nicholas Verret and his transferees in title occupied the front part of the land for a period exceeding 30 years continuously previous to the cession to the United States. Under the Spanish law 30 years' possession, even without a title deed, was recognized by the Spanish government as a title. See State v. New Orleans Land Co., 143 La. 858, 79 South. 515; United States v. D'Auterive, 10 How. 609, 13 L. Ed. 560; United States v. Pillerin, 13 How. 9, 14 L. Ed. 28; Mitchel v. United States, 9 Pet. 760, 9 L. Ed. 283; Strother v. Lucas, 12 Pet. 411, 9 L. Ed. 1137; 2 White's New Recompilation, 734.

This court has recognized as a historical fact that the Spanish government did not contest the validity of land grants made by the French authorities subsequent to the cession of the territory by France to Spain, but before the latter government took possession; and the court has judicially declared that the failure of the Spanish government to contest such grants, after long-continued possession on the part of the grantee and his assigns, amounted to a tacit ratification and confirmation on the part of Spain. In Devall v. Choppin, 15 La. 575, it was said:

"In relation to the question raised by plaintiff whether the French authorities had the right to grant lands in Louisiana in 1767, it will be conceded that it comes rather late and

with bad grace from a party who suffered his title to lay dormant for upwards of half a century; and, as we deem it entirely useless to make it a matter of serious investigation in this suit, let it be sufficient for us to remark that it is historically known that the Spanish government never contested the validity of the grants made by the French officers before the Spaniards took possession of the colony; that the conduct of Spain amounts to at least a tacit ratification; and that the government of the United States, by the fourth section of the act of March 2, 1805, has expressly declared that all French grants made while the French government had the actual possession of the territory of Louisiana should be recognized and protected."

The record discloses that in March, 1837, Gov. A. B. Roman discovered that the Nicholas Verret grant, as well as the Hebert and Cormie grants, had not been registered or filed with the commissioners, and therefore had not been approved by the government of the United States. The omission to have the grants registered was perhaps due to the fact that Mitchel Cantrelle, who owned the land when the Louisiana Territory was ceded to the United States, was Spanish commandante. He remained in office by virtue of the act of Congress approved October 31, 1803 (2 Stat. 245), and served as deputy register under the first act of Congress providing for the registration and confirmation of land titles. When Gov. Roman undertook to record the grant in the land office at New Orleans, the register applied to the commissioners at Washington to have the claim approved under the act of Congress of the 6th of February, 1835 (4 Stat. 749). The statute allowed two years in which to present such claims for registry. The commissioners agreed that Gov. Roman should have the benefit of the statute; but he failed to avail himself of it within the two years. Thereafter—that is, in May, 1846—he filed suit in the United States District Court against the United States for confirmation of his title under the Nicholas Verret grant for the tract having 18 arpents front on the

Mississippi river and extending back to the Bayou Icetaman, and to have it decreed that the property had never formed a part of the public domain or vacant land ceded to the United States, but had, on the contrary, been private property, protected by the Treaty of Cession. The suit was brought under the provisions of the act of Congress of May 26, 1824 (4 Stat. 52), authorizing the institution of such suits to confirm titles that were not complete when the territory of Louisiana was ceded to the United States, and under the act of Congress approved June 17, 1844 (5 Stat. 676), extending for 5 years the time within which such suits might be brought. On the 9th of June, 1849, the United States District Court rendered judgment confirming Gov. Roman's title under the Nicholas Verret grant for 6,906.12 arpents of land described as—

"situated in the parish of St. James, at the Bayou of Cabahan Nosee, said land fronting on the Mississippi and commencing at a point 9 arpents below said Bayou, at the upper line of the property possessed and occupied by the petitioner (A. B. Roman) and acquired from Onezime Roman, running back on the lower side 321 chains in the direction south 45' east until the same strikes the Bayou Icetaman, fronting on the river 18 arpents, and running back on its upper line 386 chains in the direction south 41° 15' west until it strikes the aforesaid Bayou Icetaman, the two side lines being joined by the back line 308 chains long and having a direction south 78° east, according to the plat of the survey of said land filed in this cause and marked A."

Roman's claim for the tract of 9 arpents and 6 toises front by the depth of 40 arpents, under the Hebert and Cormie grants, was rejected for want of jurisdiction, ostensibly because the Hebert and Cormie grants were complete at the time of the cession, and the court therefore had not jurisdiction to approve such claims under the acts of 1824 and 1844.

The United States government appealed to the Supreme Court, and a decision was

rendered at the December term ordering the suit dismissed for want of jurisdiction under the acts of 1824 and 1844. The ruling was that the acts of 1824 and 1844 gave the court jurisdiction to confirm only inchoate and equitable titles and to convert them into absolute and legal titles, and that therefore the court had not jurisdiction over a claim that was complete and absolute. After announcing that the court had already decided, in certain cases referred to in the opinion, that grants of that description or character were void unless confirmed by the Spanish authorities before the cession of the territory to the United States, it was said that in some of the cases then before the court the evidence showed continued possession by the grantees or those claiming under them ever since the grants were made. Referring to the claims then under discussion, namely, the claims of A. B. Roman, Armand Pilleran, Carlos De Villemont's heirs, and Jean B. Labranche's heirs, it was said that all of the grants were absolute or upon conditions subsequent, and that, if such titles were afterwards recognized by the Spanish authorities, they were protected by the treaty, were independent of any legislation by Congress, and did not require any proceeding in a court of the United States to give them validity. For the reason that the grants were complete and did not require an adjudication by the court to give them validity, it was held that the court did not have jurisdiction of the claims under the acts of 1824 and 1844. For that reason alone the cases were remanded to the District Court with direction to dismiss the petitions for want of jurisdiction. The decision is reported in 13 How. 9, 14 L. Ed. 28, viz.:

"But if there had been such a continued possession, and acts of ownership over the land as would lay the foundation for presuming a confirmation by Spain of these grants, or of either of them or any portion of either of them, such confirmation would amount to an absolute title, and not an inchoate or imperfect one. For all of the grants are absolute, or upon conditions subsequent, and, if they had been originally made by competent authority, would have passed the legal title at the time, subject to be devested by a breach of the condition, in the cases where a condition subsequent is annexed. Such a title, if afterwards recognized by the Spanish authorities, is protected by the treaty, and is independent of any legislation by Congress, and requires no proceeding in a court of the United States to give it validity.

"Titles of this description were not therefore embraced in the acts of 1824 and 1844, under which these proceedings were had. These laws were passed to enable persons who had only an inchoate and equitable title to obtain an absolute and legal one, by proceeding in the District Court in the manner prescribed. And when the title under which the party claims would be a complete and absolute one, if granted by competent authority or established by proof, the District Courts have no jurisdiction under the acts of Congress above mentioned to decide upon its validity. The act of 1824 is very clear upon this point; and it has always been so construed by this court.

"Upon this ground the decree of the District Court in each of these cases is erroneous and must be reversed, and a mandate issued directing the petitions to be dismissed for want of jurisdiction.

"But this decision is not to prejudice the rights of the respective petitioners or either of them in any suit where the absolute and legal title to these lands or any portion of them may be in question, or prevent them from showing if they can that the French grant was recognized as valid or confirmed by the Spanish authorities before the Treaty of St. Ildefonso.

"Order.

"These causes came on to be heard on the transcript of the record from the District Court of the United States, for the Eastern District of Louisiana, and were argued by counsel, on consideration whereof, it is now here ordered, adjudged, and decreed by this court that the decree of the said District Court in these causes be, and the same is hereby, reversed and annulled, and that these causes be, and the same are hereby, remanded to the said District Court, with directions to dismiss the petitions of the claimants for want of jurisdiction."

The decision therefore was nothing more nor less than a judicial declaration that Gov. Roman's title was complete and did not need a decree of any court to confirm it.

Thereafter a bill was introduced in the Congress of the United States, being House Bill No. 391, and was referred to a committee of Congress for an investigation and report. The committee reported favorably upon the bill, viz.:

"Your committee believe the original grants in this case to be bona fide grants, and that the faith of the government is pledged for their protection; that Congress had the right to take steps for regulating these titles, and to ascertain their extent, but that it could never take any step which would invalidate or annul them without a violation of public faith. As valid titles when the cession was made, the stipulation of the Treaty of Cession makes them valid now, and good for all time to come against the government; the petitioner having been for 30 years in actual possession, deriving title from those who had held them undisturbed for full 30 years more before his title or right accrued. The petitioner had expended in improvements upon the said lands $30,000, and paid for them a large consideration. Under these circumstances, your committee begs to report a bill for his relief."

Pursuant to the committee's report, the Congress enacted "An act for the relief of A. B. Roman, of Louisiana," approved July 17, 1854 (10 Stat. 785), viz.:

"Chap. XCVI.—An act for the relief of A. B. Roman, of Louisiana. July 17, 1854.
"All the right, &c. the United States have in certain lands confirmed to A. B. Roman.
"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that A. B. Roman, of the parish of St. James, and state of Louisiana, be, and he is hereby, confirmed in all the right, title, and interest, now held or possessed by the United States in and to the following lands, now in his occupation, to wit: Eighteen arpents front on the right bank of the Mississippi river, and running back to the stream or bayou called Icetaman, in said parish, being part of a French grant made to Nicholas Verret in seventeen hundred and sixty-five; and

also nine arpents and six toises front, adjoining the first described tract, with the depth of forty arpents, for the nine arpents and six toises front, the said last described tract consisting of two complete grants made by the Spanish government to Joseph Hebert and Jean Baptiste Cormie on the twenty-seventh of September, seventeen hundred and seventy-three, and the two tracts so described containing seven thousand four hundred and thirty-eight acres of lands:
"Proviso.
"Provided, that this act shall only be construed to vest in the said A. B. Roman the rights, title, and interest, in said lands now held and possessed by the United States, and shall not be construed in any way to impair the bona fide rights, interests, or claims, acquired by any other person under adverse grants, concessions, or purchases, made prior to the passage of this act.
"Patent to be issued for said lands.
"Sec. 2. And be it further enacted, that a patent be, and the same is hereby, directed to be issued to the said A. B. Roman for the lands described in this act.
"Approved July 17, 1854."

Pursuant to the act of Congress approved July 17, 1854, the General Assembly of the state of Louisiana enacted a statute relinquishing any claim that she might have to the land, being Act No. 114 of 1855, p. 120, viz.:

"No. 114. An act for the relief of A. B. Roman.
"Relinquishment by the state of title to certain lands in favor of A. B. Roman.
"Section 1. Be it enacted by the Senate and House of Representatives of the state of Louisiana in General Assembly convened, that the state of Louisiana does hereby relinquish, now and forever, in favor of A. B. Roman, his heirs and assigns, all the rights, titles and interest which the said state may now have in and to the following lands, to wit: Eighteen arpents front on the right bank of the Mississippi river and running back to the stream or bayou called 'Jcetaman,' in the parish of St. James, being part of the French grant made to Nicholas Verret in seventeen hundred and sixty-five; and also nine arpents and six toises front adjoining the first-described tract, with the depth of forty arpents for the nine arpents and six toises front; the said last-described tract consisting

of two complete grants made by the Spanish government to Joseph Hébert and Jean Baptiste Cormier, on the twenty-seventh day of September, seventeen hundred and seventy-three, and the two tracts so described containing seven thousand four hundred and thirty-eight acres."

[1] It is argued by the learned counsel for the state that the Act No. 114 of 1855 is absolutely null and of no effect. It is not contended that the act violates any of the provisions of the state Constitution or conflicts with any provision of the federal Constitution or of any act of Congress. The argument is merely that, if the Nicholas Verret grant had not been approved, a sixteenth section would fall in place in that township, and that the sixteenth section would be held by the state, not as owner, but as trustee for the inhabitants of the township, and that the state could not dispose of the sixteenth section except in the manner authorized by the Act No. 321 of 1855, providing the manner of sale of sixteenth sections under authority of the act of Congress approved February 15, 1843 (5 Stat. 600, c. 33), authorizing the Legislature to provide for the sale of the lands reserved for school purposes. There might be some merit in the argument if Act No. 114 of 1855 was merely an act of gratuity. But it was not. The act was merely an acknowledgment on the part of the state of what the United States Supreme Court, and in turn the Congress of the United States, had declared to be true; that is, that the Nicholas Verret grant did not need confirmation, and that the state therefore did not acquire a sixteenth section or school section in township 13 south, range 16 east, in the southeastern land district. The state did not lose anything by conceding that there was no sixteenth section in that township; because, under sections 2275 and 2276 of Rev. Stat. U. S. (Act Approved February 25, 1859, c. 58, 11 Stat. 385), the state was entitled to lieu scrip or indemnity scrip for 640 acres of public land, to be selected elsewhere in the same land district. It is admitted in the brief filed on behalf of the state that the land in contest in this suit was in 1855 and for many years thereafter absolutely without value; that it was a low cypress swamp, and was so far from being accessible that the timber had no value. In fact, it is admitted that the land and timber would not have been worth the cost of making a survey. Under these circumstances, it can hardly be said that it was a lack of wisdom, much less that it was unfair to the inhabitants of the township, for the state to relinquish whatever right she might have had to contest the claim of Gov. Roman under the Nicholas Verret grant. Whether the statute of 1855 was or was not unfair to the inhabitants of the township, however, is not a legal question, but a political question, which might have been, and perhaps was, suggested to the Legislature before the act was approved. It is sufficient to say that the inhabitants of the township are not plaintiffs in this suit. However unfair the statute might have been to them, it would be far less fair, at this late date, to say that the state should repudiate her act and take the land from those who have bought it in good faith, having confidence in the statute. The only possible reason for which the statute might be held invalid would be that it violated the condition on which the sixteenth sections were reserved to the state by the United States government. The answer to that argument is that the United States government had, by the act of Congress approved July 17, 1854, expressed the government's consent that the title of Gov. Roman, claimed under the Nicholas Verret grant, should be confirmed.

In State v. Ober, 34 La. Ann. 359, it was held that the state was estopped to contest the title of an individual to a sixteenth sec-

tion. The state had sold the sixteenth section for $2,200, of which one-tenth was paid in cash and the balance represented by nine promissory notes, of equal amount, payable annually, and secured by mortgage on the land. The state subsequently foreclosed the mortgage, and the land was adjudicated to a third party for $1,500, which was paid into the state treasury. Thereafter the state sued to recover the land because of certain illegalities or irregularities in the sale. Answering the argument that the state could not be estopped, because of the interest of the inhabitants of the township in which the sixteenth section was situated, the court said:

"There is no question that, were the original vendor a private individual, he would be precluded by such action from ever again claiming the land or instituting suit for its recovery, on account of defects or irregularities attending the proceedings under which he had first sold the property. He could not, and would not, under such circumstances, be listened to. Plaintiff's counsel contends that this rule does not apply to .the state, and especially as the beneficiaries of the original grant from the United States have an interest in the lands embraced therein. We think otherwise."

In the case of Riggio v. McNeely, 135 La. 391, 65 South. 552, it was held that, where the state accepted indemnity scrip under R. S. U. S. 2275 and 2276, in lieu of a sixteenth section, the effect was an abandonment on the part of the state of any claim to a sixteenth section in that township. In the case before us it does not appear that the state has accepted or made demand for indemnity scrip in lieu of a sixteenth section, there being no such section in township 13 south, range 16 east, in the southeastern land district; but the state has, by the Act 114 of 1855, expressed her satisfaction to receive indemnity scrip in lieu of the sixteenth section for the benefit of the inhabitants of the township.

[2] It is argued that the confirmation by the act of Congress of July 17, 1854, was without effect, because of the proviso that the act should not impair the bona fide rights, interests, or claims acquired by any other person under adverse claims, concessions, or purchases made prior to the passage of the act. That clause plainly refers only to private land grants, concessions, or purchases. It cannot reasonably be construed as applying to the reservation of sixteenth sections to the state. Such a proviso appears in nearly, if not quite, all such confirmatory acts of Congress and in land patents issued by the United States.

[3] Counsel for plaintiff contend that Gov. Roman's failure to present his claim to the register and receiver of the land office for registry and approval within two years after the passage of the act of Congress approved February 6, 1835 (4 Stat. 749), was an abandonment or forfeiture of his claim. We do not think so. A situation somewhat similar was presented in the case of Public Schools v. Walker, 9 Wall. 282, 19 L. Ed. 576. In that case there had been reserved to certain towns and villages in the state of Missouri by the act of Congress of June 13, 1812 (2 Stat. 748), certain lands "then not rightfully owned or claimed by any private individual." The school ,board sued for a tract of land occupied by the defendant, claiming title from Joseph Brazeau, who had claimed the land prior to the passage of the act of 1812. Brazeau had made application to the commissioners for confirmation of his title, but it had been rejected. Another commission was organized in 1832, which reported favorably on Brazeau's claim, and Congress, by act approved July 4, 1836, confirmed the claim. It was contended on behalf of the school board that Brazeau should have sued for confirmation of his claim under the act of 1824. In answer to the argument, the Supreme Court conceded

that Brazeau had no claim that could be legally asserted between the time of the passage of the act of 1824 and the time of the passage of the act of 1832 organizing the new board of commissioners. But the court held that Brazeau's failure to avail himself of the provisions of the act of 1824 was not a denial that the land "was rightfully claimed" by him. We quote from 76 U. S. (9 Wall.) 288, 19 L. Ed. 576, viz.:

"We must inquire whether the fact that Brazeau had failed to assert his claim within the time limited by Congress proved that his claim was not rightful. For, as a board of commissioners has said that it was rightful, and as Congress has also said it was, this proposition can only be refuted by holding that his failure to assert it for a time, and the declaration of Congress that he could not be heard to assert it afterwards, proved that it was not rightful.

"We do not think it had this effect. If it be treated as a statute of limitation, it is not the doctrine on which such statutes are founded that lapse of time proves the wrongfulness of the claim. They are made for the repose of society and the protection of those who may in that time have lost their means of defense. It is a mere declaration of the lawmaking power to the plaintiff that, having voluntarily slept so long upon his rights, he shall not now be permitted to assert them, to the injury of individuals and the disturbance of society.

"In the class of cases before us the act was nothing more than the declaration of the sovereign power, who at the same time held the fee of the land, that if you establish your equitable claim to the land within a certain time, I will confer the title; if you do not, I will not afterwards hear you assert it. But it was competent for the sovereign, after this forfeiture had occurred by laches, to release it, to consent to hear the claimant, and to give him another chance to prove the rightfulness of his claim. And this is what Congress did by the act of 1832."

Counsel for plaintiff cite, as opposed to the doctrine announced in the case last quoted; the decision in Ham v. Missouri, 18 How. 126, 15 L. Ed. 334, and the decision in Menard's Heirs v. Massey, 8 How. 293, 12 L. Ed. 1085. The decision in Ham v. Missouri would be somewhat appropriate to this

case if the state of Louisiana had not relinquished her claim, as she did by act No. 114 of 1855. In the case cited the Spanish grant in contest had been rejected by the commissioners in 1811, had remained dormant for 17 years, and was then confirmed. In the meantime the United States had, by an act of March 6, 1820, granted to the state of Missouri for use of schools every sixteenth section "not sold or otherwise disposed of." The ruling was that the subsequent confirmation of the Spanish grant merely relinquished whatever title the United States then had, and that the title acquired by the state of Missouri under the act of March 6, 1820, was superior to that acquired by the grantee under the confirmation of the Spanish grant. The plain distinction between that case and the one before us is that in the case before us the defendant does not depend entirely upon the act of Congress of July 17, 1854, confirming the Nicholas Verret grant; for the grant was declared complete and not needing confirmation by a decision of the United States Supreme Court before Congress confirmed the grant.

The decision in Menard's Heirs v. Massey was based upon the conclusion that the Spanish grant in contest was absolutely invalid. It had been made, not by the French authorities, but by the Spanish authorities, in 1799, presumably under the regulations of the Spanish government, which, however, had not been complied with. There was no survey of the land, nor means of locating or identifying any particular tract. The decision is therefore not at all appropriate to the case before us.

[4] It is argued by counsel for plaintiff that the description in the Nicholas Verret grant is not sufficient to identify the land. All that is lacking in the description is the location of the rear boundary. It does not appear from the record that the surveyors

had any difficulty in locating the land from the description given, "20 arpents front with all the depth that can be found, on a tract of land adjoining and below the one he (Nicholas Verret) now occupies, situated on the River St. Louis or Mississippi, at the place called Cabanece, above and on the other side of New Orleans." The last government survey of this township, made in 1856, and approved by the surveyor general on the 20th of January, 1857, locates the grant precisely as it was located in the survey which was annexed to the petition filed in the United States District Court in the suit of A. B. Roman against the United States.

It is argued on behalf of the state that, if the Nicholas Verret claim had been presented to the commissioners for approval under the act of February 6, 1835, the claim would have been approved only to the depth of 40 arpents, which would not have gone as far back from the river as the place where the sixteenth section would be located. The answer to that argument is that the act of Congress of July 17, 1854, confirmed the grant for its full depth back to the bayou called Icctaman, and the act of the Legislature of this state, Act No. 114 of 1855, relinquished the state's claim for all land back as far as the same bayou, called "Jeetaman."

In a supplemental brief filed on behalf of defendant our attention is called to the fact that in one of the cases that was consolidated and tried with that of United States v. Roman—i. e., the case of United States v. Labranche's Heirs—the depth of the grant was stated precisely as in the Nicholas Verret grant, viz. "sur toute la profondeur qui pourra s'y trouver"—with all the depth that may be found. The grant was in the same language and form as the Nicholas Verret grant. It was made by the same French officers in 1765, the same year in which the Nicholas Verret grant was made. This grant, held by the Labranche heirs, was con-

firmed to the full depth back to Bayou Des Allemands, or Lake Des Allemands, the first water course behind the grant. See American States Papers, Public Lands, vol. 3, p. 580, No. 19. There is therefore no reason to doubt that, if the Nicholas Verret grant had been submitted to the commissioners for confirmation, it would have been confirmed to the full depth for which it was confirmed by the act of Congress of July 17, 1854, and the act of the Legislature of this state (Act No. 114 of 1855). In fact, the depth for which the grant held by the Labranche heirs was confirmed appears to be greater than the depth for which the Nicholas Verret grant was confirmed.

Referring to the plea of res judicata founded upon the decision of the United States Supreme Court in United States v. Roman, it may be conceded that the decision does not, technically, have the force or effect of the thing adjudicated, because the ruling merely ordered the case remanded to be dismissed by the District Court for want of jurisdiction. But we could not now hold that the Nicholas Verret grant was not a complete or perfect title, without deciding contrary to the decision of the United States Supreme Court; for that decision was based solely upon the conclusion that the Nicholas Verret grant was a complete and perfect title. If the court had not so held, the decree of the court would have been one of confirmation of the title. It would be not only a technical, but an anomalous, doctrine to announce that the decision is not final and conclusive on the question of completeness of the Nicholas Verret grant, merely because, as a general rule, the reasons for a judicial decree are not part of the decree itself.

Our conclusion is that the judgment appealed from is erroneous and should be reversed.

The judgment appealed from is annulled,

and it is now ordered, adjudged, and decreed that the state's demand be rejected, and the suit dismissed at appellee's cost.

MONROE, C. J., takes no part.

PROVOSTY, J., concurs in the decree; does not concur on the point of estoppel.