STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-248


STATE OF LOUISIANA, ET AL.

VERSUS

LOUISIANA LAND & EXPLORATION CO., ET AL.



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 82162
HONORABLE JEROME M. WINSBERG, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN D. SAUNDERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.



AFFIRMED, IN PART, REVERSED, IN PART,
AND REMANDED.

**Thomas E. Balhoff**
**Rodell, Parsons, Koch, Blache, Balhoff & McCollister**
**A Law Corporation**
**8440 Jefferson Hwy., Suite 301**
**Baton Rouge, LA 70809**
**(225) 929-7033**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Louisiana Department of Natural Resources**

**Russell K. Zaunbrecher**
**Edwards, Stefanski & Zaunbrecher**
**P.O. Drawer 730**
**Crowley, LA 70527-0730**
**(337) 783-7000**
**COUNSEL FOR PLAINTIF/ APPELLANT:**
**Vermilion Parish School Board**
**State of Louisiana**

**K. Wade Trahan**
**Ottinger Hebert, L.L.C.**
**P. O. Drawer 52606**
**Lafayette, LA 70505-2606**
**(337) 232-2606**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Chevron U.S.A., Inc.**
**Union Oil Company of California**
**Chevron Midcontinent, L.P.**
**Carrollton Resources, LLC**
**Union Exploration Partners, LP**

**Michael R. Phillips**
**Louis M. Grossman**
**Claire E. Juneau**
**Jeffrey J. Gelpi**
**Kean Miller, LLP**
**909 Poydras Street, Suite 3600**
**New Orleans, LA 70112**
**(504) 585-3050**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Chevron U.S.A., Inc.**
**Union Oil Company of California**
**Chevron Midcontinent, L.P.**
**Carrollton Resources, LLC**
**Union Exploration Partners, LP**

**L. Victor Gregoire**
**Alan J. Berteau**
**Kean Miller, LLP**
**400 Convention Street, Suite 700**
**Baton Rouge, LA 70802**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/APPELLEE:**
      **Chevron U.S.A., Inc.**
      **Union Oil Company of California**
      **Chevron Midcontinent, L.P.**
      **Carrollton Resources, LLC**
      **Union Exploration Partners, LP**

**Grady J. Abraham**
**Attorney at Law**
**5040 Ambassador Caffery Parkway**
**Lafayette, LA 70508**
**(337) 234-4523**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
      **Vermilion Parish School Board**
      **State of Louisiana**

**Jerold Edward Knoll**
**The Knoll Law Firm, L.L.C.**
**233 South Main Street**
**Marksville, LA 71351**
**(318) 253-6200**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
      **State of Louisiana**
      **Vermilion Parish School Board**

**Ryan M. Seidemann**
**Assistant Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6085**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
      **State of Louisiana**

**Donald T. Carmouche**
**Victor L. Marcello**
**John H. Carmouche**
**William R. Coenen, III**
**Brian T. Carmouche**
**Todd J. Wimberley**
**Ross J. Donnes**
**D. Adele Owen**
**Leah C. Poole**
**Caroline H. Martin**

**Christopher D. Martin**
**Talbot, Carmouche & Marcello**
**17405 Perkins Road**
**Baton Rouge, LA 70810**
**(225) 400-9991**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
 **Vermilion Parish School Board**
 **State of Louisiana**

 **Kathy S. Boudreaux**
**Attorney at Law**
**220 S. Jefferson Street**
**Abbeville, LA 70510**
**(337) 898-5777**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
 **Vermilion Parish School Board**
 **State of Louisiana**

**Robert E. Meadows**
**Carol M. Wood**
**Andrew M. Stakelum**
**King & Spalding LLP**
**1100 Louisiana, Suite 4000**
**Houston, TX 77002**
**(713) 751-3200**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **Chevron U.S.A., Inc.**
 **Union Oil Company of California**
 **Chevron Midcontinent, L.P.**
 **Carrollton Resources, LLC**
 **Union Exploration Partners, LP**

**SAUNDERS, Judge.**

This case involves the State of Louisiana (the state) and the Vermilion Parish School Board (VPSB) suing various defendants including Union Oil Company of California (Unocal) seeking remediation of the Sixteenth Section School Lands in Vermilion Parish. The land is owned by the State and is managed by VPSB.

Unocal admitted it was responsible for environmental damage to the property under the 2006 version of La.R.S. 30:29, i.e., Act 312. This admission was specifically for the purpose of Act 312's goal of assuring that funds awarded for damaged property were used to actually repair the property to a suitable status under state environmental regulations. This admission by Unocal was not an admission relative to any damage claims brought against it. In May of 2015, a jury returned a verdict awarding damages to the plaintiffs in addition to remediation. In accordance with the 2006 version of La.R.S. 30:29, the matter was referred to the Louisiana Department of Natural Resources, Office of Conservation (LDNR), for a public hearing. LDNR rejected both parties' plans and structured its own plan, which was subsequently adopted by the trial court. The initial cost estimate for the Plan was $1,411,190.00.

Additionally, the jury found Unocal strictly liable for damage to the lands and awarded $1,500,000.00. The jury denied plaintiffs' remaining claims. Both Unocal and VPSB appeal.

## FACTS AND PROCEDURAL HISTORY

VPSB on its behalf, and that of the state, filed a petition for damages to Sixteenth Section School Lands on September 2, 2004, seeking damages and remediation of property owned by the state and managed by VPSB. The property at issue was allegedly polluted by oil and gas exploration and production performed pursuant to an oil, gas, and mineral lease originally granted on the property in 1935

and a surface lease granted in 1994. The plaintiffs claim damages to the land's soil, surface waters, and ground waters.

The plaintiffs urge various causes of action in their petition including negligence, strict liability, unjust enrichment, trespass, breach of contract, and other violations of both the Mineral Code and the Civil Code. The plaintiffs seek money damages for a comprehensive evaluation of the contamination of the property, remediation of the property, diminution in the property's value, mental anguish, and inconvenience. Further, the plaintiffs seek punitive and stigma damages.

Several defendants were named in the original petition and in supplemental and amending petitions as companies which conducted, directed, controlled, or participated in various oil and gas exploration and production activities as operators and/or working interest owners, and/or joint venturers in the East White Lake Field. The defendants are: Unocal, Carrollton Resources, LLC, Chevron, U.S.A., Inc. ("Chevron, U.S.A."), and Chevron Midcontinent, L.P.

The defendants removed the matter to federal court in the Western District of Louisiana based on diversity jurisdiction under 28 U.S.C. § 1332. VPSB filed motions to remand, arguing that diversity jurisdiction does not exist because the state is a plaintiff. The district court denied the motions to remand because it concluded that the state is a nominal party with no real interest in the controversy. After denying the motions to remand, the district court granted the plaintiffs permission to immediately appeal the decision under the authority 28 U.S.C. § 1292(b).

The plaintiffs filed an appeal with the United States Fifth Circuit. The Fifth Circuit concluded that "the State of Louisiana is a real party in interest . . . the presence of which defeats diversity jurisdiction." The court reversed the order of the district court and remanded the matter to federal district court with instructions to remand the entire case to state court.

2

Thereafter, for purposes of Act 312 of 2006, under La.R.S. 30:29(C), Unocal admitted that it was responsible for environmental damage on the property and filed a motion to refer the case to the LDNR as required by the Act. The plaintiffs objected, arguing that such a referral to LDNR could not take place until all the defendants admitted responsibility, and the private claims were tried by a jury. The trial court agreed with the plaintiffs. Unocal sought writs in this court and the supreme court. These writ applications were denied.

On October 28, 2008, defendants filed a peremptory exception of prescription, noting that VPSB's tort claims are untimely and barred. In response, VPSB filed a motion to refer prescription to the merits. VPSB argued at the time that the evidence necessary to prove the case is the same as that to prove entitlement to relief. Accordingly, according to VPSB, although issues of prescription are ordinarily decided by a court prior to trial, this case fell into an exception for cases where "the evidence on the merits and on prescription is intertwined, and where judicial resources would be wasted by holding separate trials on the prescription exception and the merits." VPSB urged the Court to defer defendants' exceptions of prescription to the merits of the case. Further, VPSB pointed out that the state was a party to the proceedings, and prescription does not run against the state.

On June 1, 2009, the trial court granted the VPSB's motion. Thus, it deferred the exception of prescription to after the trial on the merits.

Unocal then filed a motion for partial summary judgment limiting the plaintiffs' remediation damage claims to the amount needed to fund the "feasible plan" mandated by Act 312. Unocal argued that Act 312 acts as a substantive cap on remediation damages resulting from a tort or the implied restoration obligation of a mineral lease. The trial court agreed.

3

The plaintiffs filed a writ application to this court on this issue. While the writ application was under consideration, the plaintiffs filed a motion in the trial court seeking to have Act 312 declared unconstitutional as applied. The trial court denied this motion and this court, likewise, denied a writ on the constitutionality of Act 312, based on the potential for the question of constitutionality be rendered moot by a successful appeal of the prior ruling regarding application of Act 312. Thereafter, the trial court's rulings on the motion for partial summary judgment and the motion to have Act 312 declared unconstitutional were certified as final judgments, and the plaintiffs lodged an appeal.

While that appeal was pending, the plaintiffs filed a writ to this court, alleging that the trial court erred in allowing Chevron U.S.A. to amend its answer to reverse its prior admission that it was a successor in interest to Unocal. Prior to this court acting on that writ, the trial court ordered a limited deposition concerning the relationship between Chevron U.S.A. and Unocal. After the deposition, the trial court granted Chevron U.S.A.'s motion for summary judgment and dismissed it from the suit. The plaintiffs filed a suspensive appeal from the trial court's judgment dismissing Chevron U.S.A. This court granted the plaintiffs' writ application regarding Chevron U.S.A.'s allowed amendment to its answer for the sole purpose of consolidating it with the already pending plaintiffs' suspensive appeal of the trial court's grant of summary judgment dismissing Chevron U.S.A. Thereafter, all of these pending matters were consolidated with the plaintiffs' appeal from the partial summary judgment in favor of Unocal regarding Act 312 limiting damages.

In *State v. Louisiana Land & Expl.Co.*, 10-1341 (La.App. 3 Cir. 2/1/12), 85 So.3d 158, this court found the language of La.R.S. 30:29 to be clear and unambiguous, notwithstanding the judgment of the trial court and the defendants' arguments. Relying on Section H of the statute, this court held: "La.R.S. 30:29, by

4

its clear language, provides for a landowner to recover damages in excess of those determined in the feasible plan whether they are based on tort or contract law." *Id.*, at 162. In so finding, this court reversed the judgment of the trial court granting partial summary judgment in favor of the defendants on that issue. Because this determination overturned the lower court's judgment regarding application of Act 312 to limit damages, this court found it unnecessary to address VPSB's argument that Act 312 is unconstitutional as applied by the trial court.

This court further found the trial court erred in granting summary judgment dismissing Chevron U.S.A. from the suit and reversed the trial court's ruling on this issue. This court held:

> It seems, at the very least, that there is a genuine issue of material fact as to whether Chevron U.S.A., Inc. is a successor in interest to Unocal. It took Chevron U.S.A. Inc. three years to determine that it had erred in its initial declaration that it was a successor in interest to Unocal. In making its determination, Chevron U.S.A., Inc. relied, at least in part, on the contents of service agreements that it maintained with Unocal. The School Board has not had access to these agreements and was allowed only a very limited deposition regarding the successor status of Chevron U.S.A., Inc.

*Id.* at 163.

Defendants filed a writ seeking review of this court's ruling in both regards. The Louisiana Supreme Court granted defendants' writ to determine the correct interpretation of Act 312 and whether Chevron U.S.A. should be dismissed from suit. The Supreme Court interpreted La.R.S. 30:29, in pertinent part, as follows:

> The procedure described under the Act does not interfere with private rights, whether they arise contractually or by law. The procedure under the Act does not prohibit the award of remediation damages for more than the amount necessary to fund the statutorily mandated feasible plan, nor does the procedure described in the Act intrude into the manner in which remediation damages are determined. The Act makes no changes to the normal trial procedures established by the Code of Civil Procedure. The only change accomplished by Act 312 is how the damages to remediate property are spent. Under Act 312, landowners do not receive that portion of the remediation damages award needed to fund the statutorily mandated feasible plan; these funds must be

deposited into the registry of the court. Finally, although the La. DNR has input into the plan to remediate the property, the final decision as to the remediation plan adopted rests with the court. Throughout the remediation process, the court remains the gatekeeper to ensure the purpose of the Act is accomplished— remediation of the property to the extent of the public's interest.

*State v. Louisiana Land & Expl. Co.*, 12-884, p. 16 (La. 1/30/13), 110 So.3d 1038, 1049.

The supreme court affirmed this court's judgment reversing the trial court's grant of partial summary judgment on the issue of remediation damages. In addition, the supreme court affirmed this court's judgment reversing the trial court's grant of summary judgment dismissing Chevron U.S.A. from the suit and remanded the matter to the trial court for further proceedings.

After being remanded, this case was tried before the jury in April and May 2015. Consistent with the court's earlier order, defendants proposed a jury instruction on prescription. At the start of the trial, however, the plaintiffs argued that the evidence on prescription would not be extensive and the issue should not be considered by the jury. The trial court chose not to instruct the jury on prescription. Instead, the trial court instructed Unocal to re-urge its exception. Thereafter, once the jury reached its verdict, the trial court then overruled Unocal's re-urged exception.

In its verdict, the jury found Unocal responsible for environmental damage and awarded $3.5 million to remediate the property under Act 312 in compliance with the applicable standards and regulations of the State of Louisiana. In addition, the jury found Unocal strictly liable to the plaintiffs and awarded $1,500,000.00 for the claim.

The jury rejected the VPSB's other claims finding no liability of Unocal for the plaintiffs' claims for breach of contract, negligence, or trespass. The jury also rejected the plaintiffs' claims against all other defendants.

Next, in accordance with the provisions of Act 312, on August 5, 2015, the trial court signed an order referring the case to the LDNR so that the agency could develop a feasible plan for the remediation of the environmental damage on the property at issue. In July 2016, the LDNR issued a feasible remediation plan, and the trial court adopted the plan in November 2016. Plaintiffs appealed to this court regarding the propriety of the trial court's adoption of LDNR's remediation plan. A split panel upheld the trial court, and the supreme court denied writs on the issue. *See State v. Louisiana Land & Expl. Co.*, 17-830 (La.App. 3 Cir. 3/14/18), 241 So.3d 1258, *writ denied*, 18-476 (La. 9/28/18), 252 So.3d 924,

In 2018, before commencing work on LDNR's most feasible plan, the plaintiffs filed a motion to assess costs against Unocal for the overseeing of the project. The trial court denied the plaintiffs' motion, and this court denied plaintiffs' writ application on the issue.

The plaintiffs filed another motion seeking to have the trial court assess its oversight costs against Unocal for implementation of the most feasible plan. The plaintiffs contend that while its prior motion to assess oversight costs focused on work that Unocal intended to perform, its next motion was to assess costs pertaining to work that has actually been performed so far and costs that have already been incurred by the plaintiffs. The plaintiffs maintain that the purpose for its latest motion to tax Unocal with specific oversight costs was for the plaintiffs to recover expenses that they have incurred in investigating and delineating environmental damage and conducting oversight of the implementation of the most feasible plan.

7

The trial court denied the plaintiffs' latest motion to assess oversight costs and writs were denied on the issue.

The appeal before us addresses the propriety of the trial court's denial of Unocal's exceptions of no right of action and prescription as well as the plaintiffs' assertions of improprieties in the jury trial and with the trial court's judgment implementing the jury's verdict. Following the verdict in the jury trial, both Unocal and the plaintiffs filed motions for judgment notwithstanding the verdict. Both motions were denied. Both parties appeal and assign errors.

## UNOCAL ASSIGNMENTS OF ERROR

1. The trial court erred in overruling UNOCAL's exception of no right of action because the School Board did not have statutory authority or approval from the Attorney General to bring a strict liability claim in the name of and on behalf of the State.

2. The trial court erred in overruling UNOCAL's exception of prescription because the School Board filed its strict liability claim in its individual capacity more than one year after it knew of the claim,— indeed, more than one year after it retained counsel to file suit— and the School Board is not entitled to immunity from prescription under Article 12 § 13 of the Louisiana Constitution.

## PLAINTIFFS' ASSIGNMENTS OF ERROR

The trial court committed error in:

1. Signing a judgment based on an inconsistent jury verdict;

2. Denying plaintiff's JNOV and alternative new trial motions;

3. Instructing the jury on plaintiff's Mineral Code article 11 and single business enterprise claims and then refusing to include such claims on the verdict form;

4. Including language on the jury verdict form stating that Unocal's admission of liability did not extend to "Plaintiff's claims for private damages;"

5. Adopting a prejudicial and improper Act 312 jury charge and verdict form;

6. Instructing the jury to provide an advisory opinion regarding defendants' responsibilities under La. R.S. 30:29 (Act 312 of 2006);

7. Denying plaintiff's requests for discovery of documents and witnesses;

8. Denying plaintiff's motion for new trial based on newly discovered evidence;

9. Failing to find defendants Carrollton and Mid-Continent liable under the 1935 Mineral Lease;

10. Failing to find that defendants breached the mineral and surface leases;

11. Failing to find that defendants were negligent;

12. Failing to find that defendants trespassed in disposing of offsite saltwater;

13. Awarding inadequate damages for defendants' violation of private law;

14. Finding no liability under La. R.S. 30:114 and for single business enterprise.

## UNOCAL ASSIGNMENT OF ERROR NUMBER ONE

Unocal asserts in its first assignment of error that the trial court erred in overruling its exception of no right of action because VPSB did not have statutory authority or approval from the Attorney General to bring a strict liability claim in the name of and on behalf of the State. We note that the only claim Unocal asserts that VPSB had no right to bring is that of the single claim which VPSB successfully brought, a claim under La.Civ.Code art. 2317, which states, in pertinent part, the following: "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.

"The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit." *Hood v. Cotter*,

9

2008-0215, p. 17 (La.12/2/08), 5 So.3d 819, 829. An appellate court reviewing a lower court's ruling on an exception of no right of action should focus on whether the particular plaintiff has a right to bring the suit and is a member of the class of persons that has a legal interest in the subject matter of the litigation, assuming the petition states a valid cause of action for some person. *Id.*; *Badeaux v. Southwest Computer Bureau, Inc.*, 2005-0612, p. 6-7 (La.3/17/06), 929 So.2d 1211, 1217; *Turner v. Busby*, 2003-3444, p. 4 (La.9/9/04), 883 So.2d 412, 415-416; *Reese v. State, Dept. of Public Safety and Corrections*, 2003-1615, p. 3 (La.2/20/04), 866 So.2d 244, 246.

The determination whether a plaintiff has a right to bring an action raises a question of law. A question of law requires de novo review. *Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.*, 2006-0582, p. 9 (La.11/29/06), 943 So.2d 1037, 1045.

*Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267, 10-2272, 10-2275, 10-2279, 10-2289, pp. 6-7 (La. 10/25/11), 79 So.3d 246, 255-56.

Unocal argues that VPSB did not have authority to bring a strict liability claim on behalf of the State. Unocal bases its argument on La.R.S. 41:961, which states (emphasis added):

The school boards of the various parishes of the state may contract with and employ on the part of the State of Louisiana, attorneys at law, to recover for the state, damages for *trespass* to the sixteenth section known as school lands the title to which is still in the state. Each of the boards may make these contracts for the lands situated in its own parish and no others. The school boards may also sue for and *recover* the sixteenth section known as school lands.

According to Unocal, the clear and unambiguous statutory language authorizes school boards to bring claims *only* for trespass and recovery of title. Thus, Unocal asserts that VPSB lacked statutory authority, and, as such, had no right of action to bring its non-trespass tort claims in the State's name.

VPSB counters by pointing out that school boards have previously been permitted to bring claims other than trespass or recovery of title. The school board in this very case, VPSB, was permitted to bring claims other than trespass and recovery of title in the state's name in *Vermilion Parish School Board v.*

*ConocoPhillips Co. et al.*, 11-999 (La.App. 3 Cir. 2/1/12), 83 So.3d 1234, *writs denied*, 12-514, 12-515, 12-516 (La. 6/22/12), 91 So.3d 968.

In *ConocoPhillips*, a school board brought breach of contract claims in the state's name for nonpayment or underpayment of royalties under a mineral lease. There, the trial court found that the state had no cause of action for the claims because the school board was the sole lessor under the mineral lease so the school board was the only proper party that could bring the breach of contract claims. The school board countered that it brought the action in the state's name as agent and administrator of the Sixteenth Section lands and mineral interests.

This court did not specifically address whether the school board in *ConocoPhillips* had a right of action to bring the claims. However, it did find that the state had a cause of action to the mineral rights' claim based on a contract confected between a school board and an oil and gas company.

Likewise, in the case before us, VPSB's inclusion of the state was found necessary by the U. S. Fifth Circuit. It held, "[t]he State of Louisiana is a real party in interest to this suit, not a mere depositary, due to its ongoing 'moral obligation.'" *La. v. Union Oil Co. of Cal.*, 458 F.3d 364, 367 (citing *State v. Humble Oil & Ref. Co.*, 195 La. 457, 197 So. 140, 143 (1940) wherein the supreme court stated "there is a moral, if not a clear legal obligation, resting upon the State to dedicate the revenues derived from such lands to public education.").

The U.S. Fifth Circuit recognized the importance of protecting Sixteenth Section lands by pointing out the moral obligation the state has per *Humble Oil*. This court has a history in agreeance with the moral obligation the state and school boards have to protect of Sixteenth Section lands. In *Ebey v. Avoyelles Parish School Board*, 03-765 (La.App. 3 Cir. 12/17/03), 861 So.2d 910, this court defined the relationship between Sixteenth Section lands, the State, and school boards as that of a public trust

11

for the benefit of public education. Assigning roles in a trust relationship relative to Sixteenth Section lands, the United States is a settlor that grants Sixteenth Section lands to the state. The state holds these lands as trustee, with the school board functioning as the state in the state's capacity as trustee when the school board enter into juridical acts involving Sixteenth Section lands.

As such, we find that the La.Civ.Code art. 2317 strict liability tort claims brought by VPSB were in furtherance of its duty to function as the state in the state's capacity as trustee of Sixteenth Section lands. Therefore, VPSB has a right of action to bring any action to protect Sixteenth Section lands from any damages resulting from activities related to those juridical acts either in its name or in the name of or on behalf of the state. This finding is in line with the "moral obligation" of the state, and the necessity of protecting and conserving Sixteenth Section lands, an economic resource for the benefit of public education. Accordingly, we find no merit to the assertion by Unocal that the trial court erred as a matter of law in denying its exception of no right of action.

## UNOCAL ASSIGNMENT OF ERROR NUMBER TWO

In its second assignment of error, Unocal contends that the trial court erred in overruling its exception of prescription because VPSB filed its La.Civ.Code art. 2317 strict liability claim in its individual capacity more than one year after it knew of the claim —indeed, more than one year after it retained counsel to file suit— and VPSB is not entitled to immunity from prescription under Article 12, § 13 of the Louisiana Constitution. We disagree.

Unocal and VPSB disagree on the standard of review applicable to this assignment of error. VPSB contends that when evidence is introduced regarding the merits of an exception of prescription, the factual determinations of the trial court are reviewed via the manifest error standard of review. Unocal points out that this

court need not give the deference present in a manifest error review to the legal conclusions made by the trial court. Rather, according to Unocal, this court must conduct a de novo review of the trial court's ruling.

In this case, the trial court deferred ruling on Unocal's exception of prescription until after the jury trial was conducted. Thus, we find that any factual findings by the trial court related to Unocal's exception of prescription are entitled to the deference present in a manifest error review rather than simply taking any allegations made in the petition as true. However, any finding of law must be reviewed de novo to determine whether it was legally correct.

> Prescription is a peremptory exception which is provided for in La.Code Civ.P. art. 927. Evidence in support or contravention of the exception may be introduced if the grounds are not apparent from the petition. La.Code Civ.P. art. 931. An appellate court reviews the exception under the manifest error standard of review if evidence is introduced in support or contravention of the exception. *Dugas v. Bayou Teche Water Works*, 10-1211 (La.App. 3 Cir. 4/6/11), 61 So.3d 826. If not, the appellate court "simply determines whether the trial court's finding was legally correct." *Id*. at 830.

*Allain v. Tripple B Holding, LLC*, 13-673, pp. 9-10 (La.App. 3 Cir. 12/11/13), 128 So.3d 1278, 1285. "Generally, prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished by it; thus, of two possible constructions, that which favors maintaining, as opposed to barring an action, should be adopted." *Nickel v. Ford Motor Co.*, 18-1035, p. 1 (La. 10/15/18), 254 So.3d 1199, 1199 (citing *Wells v. Zadeck*, 11-1232 (La. 3/30/12) 89 So.3d 1145).

At the outset, we acknowledge that school boards and the oil and gas industry have been embroiled in legal controversy regarding what prescriptive period, if any, applies to claims made by school boards relative to Sixteenth Section lands. Indeed, this issue is at the heart of conflicting jurisprudence.

Here, VPSB included the state as a party, a prudent inclusion given the established jurisprudence that it must do so or potentially face prescription. *See*

*ConocoPhillips*, 83 So.3d 1234, where the state was included as a party and the claims were held immune from prescription, as opposed to *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870 (5th Cir.2002) and *Terrebonne Par. Sch. Bd. v. Southdown, Inc.*, 03-402 (La.App. 1 Cir. 7/14/04), 887 So.2d 8, where the claims were held prescribed because immunity from prescription only applies to the state. *See also Bd. of Com'rs of Port of New Orleans v. Toyo Kisen Kaisha*, 163 La. 865, 113 So. 127 (La. 1927) and *Bd. of Com'rs of Caddo Levee Dist. v. Pure Oil Co.*, 167 La. 801, 120 So. 373 (La.1928), where the supreme court held that state immunity from prescription does not apply to state agencies unless the state was included in the action as a party. Prior to deliberation of the issue before us, in order to give a proper perspective of how this conflicting caselaw came to fruition, we look at the history of prescription relative to the state and state agencies.

In *State v. F. B. Williams Cypress Co.*, 131 La. 62, 58 So. 1033 (La.1912), *judgment amended on other grounds*, 132 La. 949, 61 So. 988 (1913), a school board filed suit a timber company for unlawful conversion of timber on Sixteenth Section land. The defendant in the case argued that because the suit was brought under Act No. 158 of 1910, which authorized school boards, and not the state, to sue for damages to Sixteenth Section lands, the applicable prescriptive period was one year. Thus, the state's constitutional immunity from prescription afforded it in any civil matter did not apply to these claims. The supreme court rejected this argument stating:

> We do not find that the act thus quoted changes the attitude or obligations of the state with respect to school lands, save in the respect, which is unimportant, that it contemplates that the school boards which are nearer to and more directly interested in the sixteenth sections in their respective parishes shall aid the state in the execution of her trust. The proposition that the rule of prescription established by the Constitution does not apply to the state in her capacity as trustee is untenable. Everything that the state holds in her capacity as sovereign she holds as trustee; and, if the rule in question does not apply for the

protection of land donated and held in trust for the public schools, it does not apply to the beds of navigable streams and tide water, which are also held in trust.

*F. B. Williams Cypress Co.*, 58 So. at 1037.

Likewise, in *State v. New Orleans Land Co.*, 143 La. 858, 79 So. 515 (La.1918), the supreme court dealt with whether acquisitive prescription tolled when the subject land was Sixteenth Section lands. In this case, the Orleans Parish board of directors of public schools sued to reclaim Sixteenth Section lands previously purchased. There, the supreme court focused on the land and its relationship to the State and schools relative to prescription when it stated:

> There is also something said about prescription having accrued as against the state and the schools. Prescription acquirendi causa does not run against the state for her own property. *State v. Buck*, 46 La. Ann. 667, 15 South. 531; 17 R. C. L. 689. Still less could it be allowed to run against the state for school land. Inherent in the state's title to such school land is a condition imposed by the act of Congress (Act Feb. 15, 1843, c. 33, 5 Stat. at L. p. 600) that the state cannot alienate same without the consent of the inhabitants of the township in which the land is situated. If, then, the state cannot alienate same by express statute to that effect without such consent, she is in no better position to do so by her laws of prescription acquirendi causa.

*New Orleans Land Co.*, 79 So. at 519.

Of note, *F. B. Williams Cypress Co.*, 58 So. 1033, and *New Orleans Land Co.*, 79 So. 515, dealt with timber and recovery of title, the two instances directly addressed in La.R.S. 41:961. In these two cases, the supreme court's analysis of whether a state agency could benefit from the state's immunity from prescription focused on the object the actions sought to protect, i.e. school lands, more than the relationship the entity bringing the action had with the State. The court's focus changed in the 1920's.

The first step to separating the entity from the state relative to prescription was the court distinguishing state agencies from the state. In *Toyo Kisen Kaisha*, 113 So. 127 and *Pure Oil Co.*, 120 So. 373, the supreme court held that prescription ran

15

against levee boards because, as state agencies, levee boards have a right to sue and be sued in their own name, are a separate entity from the State, and are distinct from the State. The supreme court went on to state that the exception to prescription running against the state does not apply state agencies unless the action was "brought by and in the name of the [s]tate itself." *Id.* at 377 (quoting *Toyo Kisen Kaisha*, 113 So. at 127).

The supreme court extended this line of reasoning and applied it to school boards in *Stokes v. Harrison*, 238 La. 343, 115 So.2d 373 (1959). In *Stokes*, the Beauregard Parish School Board purchased (non-Sixteenth Section) land and, thereafter, sold it. After the land changed hands several times over a thirty-five-year period, the owner of the land executed a mineral lease. Soon thereafter, the school board executed a separate mineral lease on the land. The oil and gas company placed the proceeds from the mineral in concursus. The school board argued that its lease was valid and trumped the other because the land became State-owned when the school board purchased it prior selling it years earlier. As such, the mineral rights were retained by the State given Louisiana's constitutional prohibition against the State alienating its mineral rights. The court ruled against the school board and stated, "a parish school board is an agency of the State, a corporate body, a political corporation, the recipient from the Legislature of certain delegated powers. . . ." Nowhere, however, do we find a parish school board called the 'State.'" *Stokes*, 115 So. at 377-78, *Id*. at 375.

The *Stokes* court relied on an applicable portion of Article IV of the Louisiana Constitution of 1921, which stated, "[i]n all cases the mineral rights on any and all property sold by *the State* shall be reserved, except where the owner or other person having the right to redeem may buy or reclaim property sold or adjudicated to the state for taxes." The court noted that the word "State" appeared alone whereas the

language "the state, or any political corporation thereof" was present in other sections of the Articles. *Stokes*, *Id.* at 379 (quoting *Stokes v. Harrison*, 109 So.2d 506, 510 (La.App. 1 Cir. 1959). As such, the court reasoned that the school boards and other political corporations of the State were purposefully excluded from the mineral rights reservation.

Some years later, the language of Louisiana Constitution of 1974 Article 9 § 4(B) specifically included school boards when considering prescription and mineral rights. It states, "[l]ands and mineral interests of the state, of *a school board*, or of a levee district shall not be lost by prescription." La.Const. art. 9, § 4(B)(emphasis added).

In 1978, the supreme court, in *Dynamic Exporation, Inc. v. LeBlanc*, 362 So.2d 734 (La.1978), acknowledged the additional language of La.Const. art. 9, § 4(B). It found that *Stokes* was overruled by this additional language that included school boards.

However, in 1981, the supreme court again differentiated a state agency from the state in dealing with prescription. In *State, through Department of Highways v. City of Pineville*, 403 So.2d 49 (La.1981), the Department of Highways loaned the City of Pineville funds to perform public works. The city did not repay the funds timely. Six years after the loan, the Department of Highways sued for repayment. Suit on repayment of a loan is subject to a three-year prescriptive period. The Department of Highways argued it was immune from prescription per La.Const. art. 12, §13, which states, "[p]rescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution or expressly by law." The supreme court rejected this argument, stating:

> [T]he "State," for the purposes of the constitutional immunity from prescription, does not include a state agency which is a body corporate with the power to sue and be sued and which, when vested with a cause

of action, is the sole party capable of asserting it. Regardless of its status as an instrumentality of the state, such an agency remains a distinct legal entity subject to claims of prescription except where the law provides otherwise.

*City of Pineville*, 403 So.2d at 52.

This line of reasoning differentiating a state agency from the state in dealing with prescription was adopted by the United States Fifth Circuit in *Terrebonne Parish School Board v. Mobil Oil Corp.*, 310 F.3d 870 (5th Cir.2002). In this case, the Terrebonne Parish School Board, in its name only, sued Mobil Oil Corporation for environmental damage resulting from Mobil's dredging of a canal some forty-two years earlier in order to access a well located on Sixteenth Section land owned by the State and managed by the school board. Mobil filed a summary judgment alleging the school board's claims were prescribed. The school board argued that it was the State for purposes of La.Const. art. 12, §13, and, therefore, immune from prescription. The court conducted an extensive analysis of Louisiana's statutes regarding school lands. In rejecting the school board's argument, the court stated, "Louisiana's statutory provision addressing precisely the same kind of restoration claims that the School Board now seeks to prosecute in its own right requires that such suit be brought *in the name of the state*." *Mobil Oil Corp.*, 310 F.3d at 882 (citing La.R.S. 41:963, "[s]uit in all cases shall be brought in the name of the State of Louisiana").

More recently, our sister court, in *Southdown*, 887 So.2d 8, dealt with yet another case wherein a school board, solely in its own name, filed suit against an oil and gas company for environmental damages to Sixteenth Section lands. In discussing whether the school board could invoke the State's immunity, the school board argued that the following excerpt from *City of Pineville*, 403 So.2d at 52 (citing *State v. F. B. Williams Cypress Co.*, 131 La. 62, 58 So. 1033 (1912)) was

18

controlling: "when the state holds title to property, prescription cannot run, notwithstanding the fact that the property is administered by a state agency." The first circuit rejected the notion that the state's immunity from prescription is confined to actions brought only by the state itself.

Finally, this court dealt with prescription relative to Sixteenth Section lands in *ConocoPhillips*, 83 So.3d 1234. In this case, the very school board party to the case before us sued multiple oil and gas companies for underpayment of royalties derived from the minerals of Sixteenth Section lands but included the state as a nominal party. The trial court granted exceptions of prescription filed by the defendants because the state was not a party to the mineral leases and the school board was not the state, and, therefore, the school board's claims were subject to prescription. Our court reversed the trial court. We found that actions involving Sixteenth Section lands were an exception to applying prescription to a state agency because the school board was an agent for the state acting on the state's behalf. We reiterated that the State owned Sixteenth Section lands and the minerals from those lands. We distinguished *Southdown* on the basis that the school board in that case included the State as a nominal party.

The conflict between our court in *ConocoPhillips* and our sister court in *Southdown* has been acknowledged by at least one law review article. *See* Howser, Zachary, *A Binding and Perpetual Obligation: Protecting Louisiana's Sixteenth Section Land as a Natural Resource*, 2 LSU Journal of Energy Law & Resources (2014). This law review article suggests that Sixteenth Section lands need classification by a court under civilian law in order help resolve conflicting jurisprudence relative to prescription. We agree and endeavor to do so.

"Things are divided into common, public, and private; corporeals and incorporeals; and movables and immovables." La.Civ. Code art. 448. "Corporeals are things that have a body, whether animate or inanimate, and can be felt or touched."

19

La.Civ. Code art. 461. "Tracts of land, with their component parts, are immovables." La.Civ. Code art. 462.

Based on the articles above, we find that these Sixteenth Section lands are corporeal, immovable things. Next, we look to whether these lands are common, public or private.

"Common things may not be owned by anyone. They are such as the air and the high seas that may be freely used by everyone comformably with the use for which nature has intended them." La.Civ Code art. 449. Under La. R.S. 41:961, in pertinent part, Sixteenth Section lands are "known as school lands the title to which is still in the state." Therefore, while these lands are not common things for various other reasons, a plethora of jurisprudence and clear legislative expression establishes that Sixteenth Section lands are owned by the state, and common things may not be owned.

"Public things are owned by the state or its political subdivisions in their capacity as public persons." La.Civ. Code art. 450. "Private things are owned by individuals, other private persons, and by the state or its political subdivisions in their capacity as private persons." La.Civ. Code art. 453. Therefore, the state may own these Sixteenth Section lands in its public or private capacity.

Public things are property "out of commerce. . . . dedicated to public use, and held as a public trust, for public uses." *Kline v. Parish of Ascension*, 33 La.Ann 562, 566 (1881). Sixteenth Section lands are not "out of commerce." The fact that they are in commerce and how to conduct that commerce is the subject of extensive caselaw. Further, La. R.S. 41:961 contemplates school boards entering into contracts in order to conduct commerce on these lands. Accordingly, it is clear that Sixteenth Section lands are not public things under La.Civ. Code art. 450, but, rather, are private things owned by the State in its private capacity.

Next, we need to determine whether these lands are subject to any restrictions regarding their use. "Private things may be subject to public use in accordance with law or by dedication." La.Civ.Code art. 455. Louisiana has not passed any applicable law mandating that Sixteenth Section lands are subject to public use. We do note the "School Dedication Statutes," La.R.S. 41:638 and 41:639, which state, respectively, the following:

> Whenever any real property has been acquired by the state of Louisiana, any municipality, parish school board, or any other subdivision or agency of the state of Louisiana by virtue of a deed, act of sale, donation, or other form of transfer, which contains a stipulation that such property is to be used for public school or public educational purposes, said deed, act of sale, donation, or other form of transfer, shall constitute a dedication of such property to the public for such purposes and the school board in whose district the property lies shall have the right to administer and use the property for public school purposes.

La.R.S. 41:638; and

> Unless the deed, act of sale, donation, or other form of transfer by which said property is conveyed, contains specific provisions prohibiting the same, such school board may sell or dispose of any such property which is unused and unnecessary or is unsuitable for public school purposes, provided the mineral rights are reserved therein to the state of Louisiana and use the proceeds thereof to procure one or more new public school sites. In such event, the former owner, his heirs, successors and assigns shall have no claim by right of reverter to the property originally dedicated or to the proceeds thereof.

La.R.S. 41:639. However, "No Section of the Revised Statutes is retroactive unless it is expressly so stated." La.R.S. 1:2. "In the absence of contrary legislative expression, substantive laws apply prospectively only." La.Civ.Code art. 6. Neither of La.R.S. 41:638 nor La.R.S. 41:639 are expressly retroactive, and both are substantive.

Here, both La.R.S. 41:638 and La.R.S. 41:639 were passed in 1960. *See* Acts 1960, No. 527. Sixteenth Section lands were given to Louisiana by approval of the Sixty-second Congress of the United States on April 23, 1912. Thus, their application of La.R.S. 41:638 and La.R.S. 41:639 to Sixteenth Section lands is not

21

appropriate. *See also Orleans Par. Sch. Bd. v. City of New Orleans*, 96-2664 (La.App. 4 Cir. 9/3/97), 700 So.2d 870, *writ denied*, 97-3094 (La. 3/13/98), 712 So.2d 877.

There is, however, jurisprudence that indicates Congress' Act granting school lands to the State of Louisiana would qualify as a formal dedication under Louisiana Law. In *Cenac v. Public Water Rights Ass'n*, 02-2660 (La. 6/27/03), 851 So.2d 1006, 1011 the supreme court stated:

> Our legislature has never enacted a comprehensive scheme governing dedication to public use. *St. Charles Parish Sch. Bd. v. P & L Inv. Corp.*, 95-2571, p. 4 (La.5/21/96), 674 So.2d 218, 221; *Garrett v. Pioneer Prod. Corp.*, 390 So.2d 851, 854 (La.1980). . . .In the absence of such a comprehensive scheme, our courts have recognized four modes of dedication to public use: (1) formal, (2) statutory, (3) implied, and (4) tacit. *P & L Inv. Corp.*, 95-2571 at p. 4-5, 674 So.2d at 221.

Professor A. N. Yiannopoulos discusses formal dedication in his scholarly writings, namely his property treatise. He writes:

> In a strict sense, a formal dedication is a donation of a thing or of its use to the public for designated public purposes. As a donation, a formal dedication ought to conform with the requirements of substance and form governing gratuitous dispositions. For example, the act of dedication ought to be made in authentic form and it ought to be accepted by the public. Examples of this form of dedication are found in Louisiana jurisprudence.
>
> However, strict compliance with the requirements governing donations would be cumbersome. It would discourage or even defeat dedication in many cases. For these reasons Louisiana courts have taken a much broader view of formal dedication that has no foundation in legislative texts. According to the jurisprudence, a formal dedication is a donation to the public that may be made by *a written juridical act*. Accordingly, neither authentic form nor acceptance of the donation by the public is required. There must be, however, a clear intent to dedicate.

A.N. YIANNOPOULOS, PROPERTY § 97, at 211-12 (2 Louisiana Civil Law Treatise 2001) (footnotes omitted) (emphasis added). Accordingly, in order to find that the Sixteenth Section lands are for public use by formal dedication, a written juridical act must exist with a clear intent to dedicate the lands for a public use.

"A juridical act is a lawful volitional act intended to have legal consequences." Comment (B) of the 2000 Revision Comments to La.Civ.Code art. 395; comment (b) of the 1982 Revision Comments to La.Civ.Code art. 3471. In 1912, Congress' Act granting school lands to the State of Louisiana states that school lands "are hereby, fixed, reserved, and confirmed to that State for the benefit of public school." (Sixty-second Congress Sess. II CH 88 1912). This act is clearly "a written juridical act," as it was lawful with intent to have legal consequences, i.e., conveying ownership of Sixteenth Section lands to the State of Louisiana. Further, Congress' Act indicates a clear intent to dedicate that Sixteenth Section land for a public purpose, public education. Accordingly, we find that Sixteenth Section lands are for public use by formal dedication.

To recapitulate, we classify Sixteenth Section lands under Louisiana's civilian law as corporeal, immovable things owned by the State in its private capacity for the benefit of a public use, public education. Next, we look how the relationship between the United States, the State, and a school board is defined.

First, we note that one possible civil definition of the relationship between the United States, the State, and a school board relative to school lands is that of mandate. In *Board of School Directors of Concordia v. Ober*, 32 La.Ann. 417, the supreme court stated (emphasis added):

> The title to this land has never been in the parish Board of School Directors. The title was in the State, under the donation of the general government, and she held it for a specific purpose, with authority to sell the lands and a *mandate* to hold the proceeds and invest them for the benefit of the schools.

This jurisprudence could be interpreted to define the relationship between state and school board regarding school lands as one of mandate. Defining the relationship as such does not fit under Louisiana law.

23

"A mandate is a *contract* by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." La.Civ.Code art. 2989 (emphasis added). "A contract is an *agreement* by two or more parties whereby obligations are created, modified, or extinguished." La.Civ.Code art. 1906 (emphasis added). Here, a school board's relationship to school lands is delineated by statute, La.R.S. 41:638. However, there is no existing contract between the state and school boards establishing a contract of mandate. The school boards did not consent to or agree to anything with the state regarding these lands. Thus, we find that the relationship between the state and school boards regarding school lands is not one of mandate.

An alternative to a mandate relationship, and one that has been found to exist by this court, is that of a trust relationship. In *Ebey*, 861 So.2d at 912-15, this court stated:

> *State ex rel. Plaquemines Parish School Board v. Plaquemines Parish Government*, 93-2339 (La.App. 4 Cir. 12/15/94), 652 So.2d 1, writ denied, 95-1049 (La.6/23/95), 656 So.2d 1015 provides an historical background:
>
> > In 1785, the Continental Congress set aside Sixteenth Section lands for the exclusive use of public education (1 Stat. 563). In 1789, Article IV Section 3 Clause 2 of the United States Constitution was adopted providing that ". . .Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . ." (emphasis added). On May 18, 1796, Congress passed the act creating a rectangular survey system (1 Stat. 464). On April 30, 1803, France sold the Louisiana territory to the United States upon execution of the Treaty of Cession. The reservation of Sixteenth Section lands attached to the Louisiana territory at this point. On April 21, 1806, Congress authorized the President of the United States to sell lands within the Louisiana territory, subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 391). On March 3, 1811, Congress again

24

authorized the President of the United States to sell further lands within the Louisiana territory, again subject to a reservation of Sixteenth Section lands for public education purposes, specifically stating that the Sixteenth Section "shall be reserved in each township for the support of the schools within the same" (2 Stat. 662). The Louisiana territory was admitted to the United States by three Congressional Acts, to-wit: 2 Stat. 641 of February 20, 1811, 2 Stat. 701 of April 8, 1812, and 2 Stat. 708 of April 14, 1812.

*Id*. at. 2-3.

Nowhere in any of these grants was the word "trust" or "trustee relationship" used. However, various states, including Louisiana, began using trust language in statutes regulating the use of Section 16 lands. *Riedel v. Anderson*[,] 70 P.3d 223 (Wy.2003) discusses the evolution in the use of trust language in the various state constitutions and statutes including Louisiana.

The specific language of the grants varied somewhat among the early states' enabling laws, but generally was "for the use of schools" with no mention of trusts, fiduciary obligations, or restrictions on the sale, lease, or other use of the lands. See, Sally K. Fairfax, et al., *The School Trust Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl. L. 797, 810 (1992). Substantially the same pattern was used for land grants in the admission of Louisiana, Indiana, Mississippi, Illinois, Alabama, Missouri and Arkansas, See, Budge, supra, at 226. Courts have consistently ruled that Congress had not encumbered these early land grants with a common law trust, but had merely entered into a "solemn agreement" with the states that the lands would be used as intended. See, e.g., *Branson Sch. Dist. Re–82 v. Romer*, 161 F.3d 619, 633 (10th Cir.1998)(citing *Alabama v. Schmidt*, 232 U.S. 168, 173-74, 34 S.Ct. 301, 58 L.Ed. 555 (1914), and *Cooper v. Roberts*, 59 U.S. (18 How.) 173, 181-82, 15 L.Ed. 338 (1855)).

However, beginning with Michigan in 1837, a pattern evolved by which the states through their own constitution imposed restrictions on the use of the land or its sale proceeds. . . .

With the admission of Colorado in 1876, Congress began to include in the states' enabling acts some of the same restrictions on the use of the school lands that prior states had constitutionally imposed upon themselves.

Id. at 227 (footnote omitted).

The concept that Section 16 lands are held by Louisiana in trust was recognized in *State ex rel. Plaquemines Parish School Board*, 652 So.2d 1, where in the court stated:

> [T]he existence of a school trust has long been established in both Louisiana and Federal jurisprudence and it has been consistently held that the school trust lands can be alienated only where it is of benefit to school in some manner such as payment of the sale or lease price to the school fund or school board.

*Id*. at 4.

In so holding, the Plaquemines court cited the United States Supreme Court case of *Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980) in which the Court stated:

> Congress also imposed upon the States a binding perpetual obligation to use the granted lands for the support of public education. All revenues from the sale or lease of the school grants was impressed with a trust in favor of the public schools. No State could divert school lands to other public uses without compensating the trust for the full market value of the interest taken.

*Id*. at 1814-15(emphasis deleted).

Regardless of whether the Enabling Act intended to create a common law trust over Section 16 lands in Louisiana, the concept of a trust has been written into Louisiana statutes and recognized by the courts. *State ex rel. Plaquemines Parish Sch. Bd.*, 652 So.2d 1; *City of Baker Sch. Bd. v. East Baton Rouge Parish Sch. Bd.*, 99-2505 (La.App. 1 Cir. 2/18/00), 754 So.2d 291.

La.R.S. 41:981(A) provides in relevant part:

[Lands] granted, appropriated, or reserved by Congress in trust to the state of Louisiana, for school purposes.

La.R.S. 41:642(A) provides in relevant part:

> The trustee title of the State of Louisiana to those 16th Section or indemnity lands granted by Congress to the State of Louisiana as trustee for the benefit of school children. . . .

The management of these trust lands is vested by the State in the local school boards. See La.R.S. 17:100.6 and La.R.S. 41:638. In *City of Baker School Board*, 754 So.2d at 293, the court stated:

Public education is a function of the sovereign. La. Const. art. 8, § 1; see also *Terrebonne Parish School Board v. St. Mary Parish School Board*, 131 So.2d 266, 270 (La.App. 1 Cir.1961). School boards perform the function of the sovereign implementing the constitutional mandate to provide public schools and to administer public education. *Shaw v. Caddo Parish School Board*, 347 So.2d 39,41 (La.App. 2 Cir.) *writ denied*, 350 So.2d 676 (1977). School boards are agencies of the state. *Rousselle v. Plaquemines Parish School Board*, 93-1916, p. 6 (La.2/28/94), 633 So.2d 1235, 1241. The task of educating the children of Louisiana rests with the individual school boards throughout the state. See *Drouin v. Board of Directors of Public Schools of Parish of Avoyelles*, 136 La. 393, 398, 67 So. 191, 192 (1915). The ownership, management and control of property within a school board's district is vested in the district, in the manner of a statutory trustee, for the accomplishment of its duty. See *Orleans Parish School Board v. City of New Orleans*, 56 So.2d 280, 284 (La.App.Orleans 1952). The general rule of ownership of property of school districts was stated in 68 Am.Jur.2d, Schools § 74 (1993), as follows:

The ownership of school property is generally in the local district or school board as trustee for the public at large. School property is thus considered public property and is not to be regarded as the private property of the school district by which it is held or in which it is located [footnotes omitted].

In *State v. Humble Oil & Refining Co.*, 195 La. 457, 197 So. 140 (La.1940), the court stated that "the right of a school board to control and administer, for the benefit of the public schools, the sixteenth section lands situated in its parish was never questioned." *Id*. at 144.

Thereafter, based on this analysis, this court, in *Ebey*, held that "Section 16 lands are held in trust by the State and managed by school boards 'in the manner of a statutory trustee' for the benefit of public education." *Id*. at 915. In defining the school board's rights, we stated in *Ebey* that school boards "'shall have the right to administer and use the property for public school purposes,' subject to statutory regulations regarding its sale or lease. La.R.S. 41:638; La.R.S. 41:631 et seq." *Id.* We reiterate these findings in *Ebey*, and define the relationship between Sixteenth

Section lands, the State, and school boards is that of trust for the benefit of public education.

This finding of a trust relationship not only comes from our finding in *Ebey*. In *F. B. Williams Cypress Co.*, 58 So. at 1037, the supreme court stated (emphasis added):

> We do not find that the act thus quoted changes the attitude or obligations of the state with respect to school lands, save in the respect, which is unimportant, that it contemplates that the school boards which are nearer to and more directly interested in the sixteenth sections in their respective parishes *shall aid the state in the execution of her trust*. The proposition that the rule of prescription established by the Constitution does not apply to *the state in her capacity as trustee* is untenable. Everything that the state holds in her capacity as sovereign she holds *as trustee*; and, if the rule in question does not apply for the protection of land donated and held *in trust* for the public schools, it does not apply to the beds of navigable streams and tide water, which are also held in trust.

Next, we address what role the State and a school board undertake in facilitating the use of Sixteenth Section lands.

> The history of the sixteenth section lands reveals that the Federal Government set aside and dedicated them for the use of public education. . . . *[T]here is a moral, [if] not a clear legal obligation, resting upon the State to dedicate the revenues derived from such lands to public education.* The framers of the various State Constitutions have clearly recognized the State's moral obligation and have embodied in the various constitutions provisions dealing with sixteenth sections, expressly dedicating the revenues from those sections to public education. At a number of sessions of the legislature, statutes have been enacted providing for the sale, leasing and operation of the sixteenth sections. From the first constitutional or legislative pronouncement up to and including the legislative session of 1934, sixteenth sections have been continuously recognized as school lands, and as such, separate and distinct from other kinds of public lands.

*State v. Humble Oil and Refining Co.*, 195 La. 457, 197 So. 140, 143 (La.1940)(emphasis added).

Given this obligation the supreme court found both moral and legal, the question arises how this court can best ensure that VPSB fulfills its duty to function as the state in the state's capacity as trustee of Sixteenth Section lands. We do so by

28

finding that Sixteenth Section lands are natural resources of the State. As such, these lands are subject to the public trust doctrine.

While there is no specific definition of the public trust doctrine in Louisiana law, "[e]lements of the doctrine are scattered throughout the Louisiana Civil Code, the Revised Statutes, the Louisiana Constitution of 1974, and several Louisiana judicial decisions. No single Louisiana law clearly defines the public trust doctrine and delineates its elements." Wilkins, James G., and Wascome, Michael, "The Public Trust Doctrine in Louisiana," 52 La.Law.Rev 861, 862 (1992). However, a national study of the doctrine by the Coastal States Organization defined the public trust doctrine as follows:

> The Public Trust Doctrine provides that *public trust lands*, waters and living resources in a State are held by the State in trust for the benefit of all of the people, and establishes the right of the public to fully enjoy public trust lands, waters and living resources for a wide variety of recognized public uses. The Public Trust Doctrine is applicable whenever navigable waters or the lands beneath are altered, developed, conveyed, or otherwise managed or preserved. It *applies whether the trust lands are publicly or privately owned*. The doctrine articulates not only the public rights in these lands and waters. It also sets limitations on the States, the public, and private owners, as well as establishing duties and responsibilities of the States when managing these public trust assets. The Public Trust Doctrine has been recognized and affirmed by the United States Supreme Court, the lower federal courts and State courts from the beginning days of this country to the present.

Coastal States Organization, PUTTING THE PUBLIC TRUST DOCTRINE TO WORK, at 3-4 (1990) (emphasis added).

Louisiana Constitution Article 9, § 1 states (emphasis added):

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment *shall be protected, conserved, and replenished* insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

This article shows that our legislature is committed to protect natural resources of the state. Further, our supreme court has recognized the public trust

doctrine at least twice. Once in *Save Ourselves, Inc. v. Louisiana Environmental Control Comm'n*, 452 So.2d 1152 (La.1984), and a second time in *Avenal v. State*, 03-3521 (La. 10/19/04), 886 So.2d 1085.

In *Save Ourselves, Inc.*, the supreme court gave notice to the presence of the public trust doctrine in La.Const. art. 9, §1 when it found that Louisiana coastal wetlands were a protected natural resource under La.Const. art. 9, § 1. In doing so, the supreme court held that determining whether an action was constitutional under La.Const. art. 9, § 1 required application of a "a rule of reasonableness" that required a balancing test between "environmental costs and benefits" and "economic, social and other factors." *Save Ourselves, Inc.*, 452 So.2d at 1157.

Thereafter, in *Avenal*, the supreme court applied this balancing test to deliberate whether freshwater introduction from the Mississippi River into saltwater marshes to combat coastal erosion was permitted by La.Const.art. 9, § 1. This introduction of saltwater would have an adverse economic impact on oyster farmers. The supreme court found that the "coastal diversion project fits precisely within the public trust doctrine," balanced its public benefit with the economic hardships the project would cause to oyster farmers, and found that the project was constitutional under La.Const.art. 9, § 1. *Avenal*, 886 So.2d at 1101.

In this case, we have classified Sixteenth Section lands as corporeal, immovable things owned by the State in its private capacity for the benefit of public use, public education. While these lands are not threatened by disappearance like those of our coastline, they are nevertheless threatened by the environmental impact of outdated practices by the oil and gas industry with becoming no longer suitable for use as an economic resource to help fund the public education of this state's children.

Therefore, we find that Sixteenth Section lands fall squarely within the public trust doctrine and recognize these lands as a natural resource of this state. The public benefit of preserving suitable use of these lands in order to help fund quality education for the children predates the United States Constitution. Two years before the adoption of the U. S. Constitution of 1787, the Congress of the Confederation provided support for public schooling by establishing the land grants in the Land Ordinance of May 20, 1785, which granted one square mile, in Section 16 of every township, to be used for the maintenance of public schools. In 1789, Article IV Section 3 Clause 2 of the United States Constitution was adopted providing that ". . . Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." France sold the Louisiana territory to the United States via the Treaty of Cession on April 30, 1803. The reservation of Sixteenth Section lands applied to the Louisiana territory and has also applied to this State since its inception.

Accordingly, while we do recognize that there is some economic impact on oil and gas companies to hold that prescription does not apply to actions involving these lands. However, a finding that VPSB's claims are immune from prescription would not impact all lands owned by the state and administered by state agencies. It would only apply to Sixteenth Section lands.

Therefore, we find that Sixteenth Section lands are natural resources of this state. We apply the public trust doctrine and find that the state's interest in funding the public education of children outweighs the potential economic hardship endured by oil and gas companies. These lands "shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people" under La.Const. art. 9, § 1. Accordingly, we find that any proper action

31

taken for their protection, conservation, or replenishment are immune from prescription under La.Const. art 12, § 13.

We do not reach this result without various considerations as to its adherence to legislative will, to jurisprudence of other courts, and to jurisprudence of our supreme court.

The result aligns with the legislature's tendency to include school boards as the state with regards to prescription on issues dealing with land. The language of Article 4 of the Louisiana Constitution of 1921 did not include school boards in its reservation of mineral rights. The *Stokes*, 115 So. 2d 373, court noted this omission and based its ruling on that omission. Our legislature overruled *Stokes* by correcting this omission some years later when the language of Louisiana Constitution of 1974 Article 9 § 4(B) specifically included school boards when considering prescription and mineral rights.

It is also in line with established jurisprudence that the state must be included as a party in order for claims to be held immune from prescription on property it owns, because we find above that school boards are acting as the state when administering Sixteenth Section lands. *See ConocoPhillips*, 83 So.3d 1234, *Mobil Oil Corp.*, 310 F.3d 870, *Southdown*, 887 So.2d 8, *Toyo Kisen Kaisha*, 163 La. 865, 113 So. 127, and *Pure Oil Co.*, 167 La. 801, 120 So. 373.

Finally, this result parallels a multitude of iterations made by our supreme court. First, it adheres to the principle of strictly construing prescription statues as stated by the supreme court in *Nickel*, 254 So.3d 1199.

Next, this result and analysis heeds *State v. New Orleans Land Co.*, 143 La. 868, 79 So. 515 (La.1918). There, the supreme court stated,

> [I]nherent in the state's title to such school land is a condition imposed
> by the act of Congress (Act Feb. 15, 1843, c. 33, 5 Stat. at L. p. 600)
> that the state cannot alienate same without the consent of the inhabitants

32

of the township in which the land is situated. If, then, the state cannot alienate same by express statute to that effect without such consent, she is in no better position to do so by her laws of prescription acquirendi causa.

*New Orleans Land Co.*, 79 So. at 519. This language recognized the state's inability to circumvent its duty to hold and protect Sixteenth Section lands by laws of prescription.

Additionally, our finding furthers the supreme court's view recognizing that "[t]he proposition that the rule of prescription established by the Constitution does not apply to the state in her capacity as trustee is untenable." *F. B. Williams Cypress Co.*, 58 So. at 1037. Finally, this result honors the supreme court's words in *Humble Oil & Refining Co.*, 197 So. at 143, wherein it found a "moral, if not a clear legal obligation, resting upon the State to dedicate the revenues derived from such lands to public education." A moral obligation recognized and expressed in this very case by the United States Fifth Circuit in *Union Oil Co. of California*, 458 F.3d 364.

Accordingly, we find that this assignment of error lacks merit. When it comes to protection of Sixteenth Section lands, as natural resources of this state, VPSB functions as the state in the state's capacity of trustee for the benefit of public education. Therefore, the La.Civ.Code art. 2317 action by VPSB is not subject to prescription under Article 12, § 13 of the Louisiana Constitution.

**PLAINTIFFS' ASSIGNMENTS OF ERROR**

VPSB's assigned errors, while numbering fourteen, can be grouped into four categories: the jury's verdict is inconsistent and, as such, the trial court committed legal error warranting reversal when it entered a judgment based on that inconsistent verdict; the trial court erroneously instructed the jury; and the trial court allowed Unocal to thwart VPSB's discovery such that discovery was not complete, especially given new evidence obtained by VPSB post trial. VPSB had requested relief in the

33

form of reversal and rendering judgment in its favor for more damages. Alternatively, VPSB requests that the judgment be reversed, in part, and remanded for additionally discovery and a new trial.

## PLAINTIFFS' ASSIGNMENT OF ERROR NUMBER ONE

VPSB, in its first assigned error, contends that the trial court committed error in signing a judgment based on an inconsistent jury verdict. We find merit to this contention.

> The manifest error standard of review provides that a jury's verdict cannot be reversed unless the court, after reviewing the record in its entirety, finds there to be no reasonable factual basis for the jury's findings and determines them to be manifestly erroneous or clearly wrong. *Stobart* [*v. State, Through DOTD*], 617 So.2d 880 [(La.1993)]. Where, however, legal error interdicts the fact-finding process, the manifest error standard no longer applies. *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252 (La.2/20/95), 650 So.2d 742. In such instances, if the record is complete, the appellate court is charged to make its own independent de novo review of the record. *Id.*

> The supreme court has recognized that inconsistent jury verdicts may, in certain circumstances, constitute such legal error, requiring the appellate court to conduct a de novo review. *See Green v. K–Mart Corp.*, 03-2495 (La.5/25/04), 874 So.2d 838. . . . [T]he reviewing court must determine whether the jury's finding is "so inconsistent as to constitute an abuse of discretion." *Id.* (citing *Wainwright v. Fontenot*, 00-492 (La.10/17/00), 774 So.2d 70). If so, a de novo review is warranted.

*Clement v. Citron*, 13-63, pp. 4-5 (La.App. 3 Cir. 6/19/13), 115 So.3d 1260, 1264.

Here, as was the case in *Clement*, we cannot find many factual conclusions drawn by the jury from the face of the jury verdict form. However, the jury found, as fact, that Unocal contaminated the Sixteenth Section lands when conducting its mineral activities, is responsible for any damages from that contamination, and that contamination did cause environmental damage to the properties.

We observe these findings of fact from the jury's answers on its verdict form. The first three questions the jury answered on the verdict form are as follows:

## REMEDIATION DAMAGES UNDER ACT 312

34

1.   Does environmental damage exist on the property in question?

Yes __✓__     No ____

2.   If environmental damage exists on the property, which of the following entities, if any, are responsible for that environmental damage?

a.   Union Oil Company of California     Yes __✓__ No ____

. . . .

3.   What amount of money, if any, do you believe is needed to clean up the property in compliance with the standards and regulations of the State of Louisiana to adequately protect the environment and public health, safety, and welfare?

$ 3,500,000

These factual findings are supported by the record. First, Unocal filed an admission, which states, "[f]or purposes of La. R.S. 30:29(C), UNOCAL admits that 'environmental damage,' as defined in La. R.S. 30:29(I)(1), exists on the Subject Property, and UNOCAL further admits that it is 'responsible' under La. R.S. 30:29 for 'environmental damage'."

Louisiana Revised Statutes 30:29(I)(1), which has since been redesignated as La.R.S. 30:29(I)(2), states, "'Environmental damage' shall mean any actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and production sites. Environmental media shall include but not be limited to soil, surface water, ground water, or sediment."

We acknowledge that Unocal's admission is limited for legal purposes and is excluded from VPSB's private law claims. However, the jury was faced with deciding whether Unocal contaminated the land causing environmental damage. Limiting the purpose of the admission does not change the fact that Unocal's

35

admission, regardless of the limited purpose, supports the jury's finding that it happened.

Second, both Unocal and VPSB's experts testified that Unocal contaminated the land causing environmental damage. As such, the jury awarded VPSB some damages due to that environmental damage caused by the contamination. Thus, it is clear from the jury verdict form that the jury found this as fact, and this finding of fact is supported by the record.

VPSB argues, *inter alia*, that given this factual finding, no reasonable jury could have found that Unocal or its predecessors did not breach the 1935 Lease or the 1994 Lease. Contrarily, the jury found no breach by Unocal of these Leases. According to VPSB, this is in direct contradiction to awarding VPSB restoration damages from Unocal under Act 312. We agree.

In an earlier decision dealing with this case, *State v. La. Land & Explor. Co.*, 12-884, pp. 10-11 (La. 1/30/13) 110 So.3d 1038, 1045-1046, the supreme court stated:

> The parties agree the 1935 oil, gas and mineral lease does not contain an express provision regarding the lessee's remediation obligation. However, an implied obligation "to return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear," unless otherwise provided, is one of the principle obligations of a lessee. La. C.C. art. 2683(3). This implied obligation existed under Articles 2719 and 2720 of the Civil Code of 1870 at the time the 1935 lease was entered into. After the 2004 revisions to the Civil Code, the implied obligation to repair or restore the thing leased has not been changed, but the Civil Code articles defining the implied obligation are now found in La. C.C. arts. 2683, *supra*, 2686, 2687, and 2692.

Further, the trial court, in its jury instructions, stated the following:

> The 1935 mineral lease contains no language that addresses the remediation and restoration obligations of the lease. Under these circumstances a lessee has the remediation obligations imposed upon him by our law, which include restoration of the property to its original pre-lease condition, less normal wear and tear, as set forth in our Civil Code.

Therefore, it is established that Unocal had a duty under the 1935 Lease to restore VPSB's land to its previous condition minus "normal wear and tear." A party breaches a lease when it undertakes an obligation to perform, and when that party fails to perform that obligation. *A Caring Home Care Servs., LLC v. de la Houssaye*, 17-31 (La.App. 3 Cir. 7/5/17), 224 So.3d 422, *writ denied*, 17-1328 (La. 11/6/17), 229 So.3d 474. Thus, it is clear that Unocal, under the 1935 Lease, had an obligation to restore VPSB's land to its previous condition minus normal wear and tear and that failure to do so is a breach of that 1935 Lease.

Calvin Barnhill, certified by the court as an expert in petroleum engineering, oilfield operations, oil and gas industry standards and regulations, application and implementation of mineral and other leases and provisions, testified on behalf of Unocal. He testified as follows, in clarifying what encompasses "normal wear and tear:"

> A. [I]f it's under regulatory requirements, then that would fit in my definition of wear and tear. If it's over regulatory requirements, then it something that needs to be addressed in a common sense fashion.
>
> . . . .
>
> Q. [T]he 1935 lease didn't give Unocal or anybody else the right to violate any of the state regulations, state laws, state standards, did it?
>
> A. It does not.

The above excerpt indicates that Unocal did not have the right to contaminate VPSB's Sixteenth Section lands under the 1935 Lease. Moreover, a finding that Unocal did have the right to contaminate VPSB's land under the 1935 Lease is contrary to law. The cause of an obligation must be lawful. La.Civ. Code art. 1966. "The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." La.Civ. Code

37

art. 1968. La.Civ.Code art. 1971 (emphasis added) states, "[p]arties are free to contract for any object that is *lawful*, possible, and determined or determinable." Here, VPSB could not have granted Unocal the right to act unlawfully in the 1935 Lease.

On the jury verdict form, the jury found as follows:

**BREACH OF CONTRACT—THE 1935 OGM LEASE**

4.  Do you find that any of the following entities breached the 1935 Oil, Gas and Mining Lease (1935 OGM Lease) by engaging in unreasonable or excessive use of the leased property?

    a.  Union Oil Company of California      Yes ___      No __✓__

This is in direct contradiction to the jury's findings in questions 1, 2, and 3 that that Unocal did contaminate VPSB's Sixteenth Section lands in awarding damages to VPSB under Act 312 remediation damages. This is also contrary to our finding above that Unocal failed to restore the land to its previous condition minus "normal wear and tear," which can only be reasonably found to be a breach of the 1935 Lease. This inconsistency is patent on the face of the jury verdict form and finding that Unocal did not breach the 1935 Lease is clearly wrong.

Additionally, regarding the 1994 Lease, Unocal had an even more burdensome duty to VPSB than under the 1935 lease. Under the 1994 Lease, Unocal had to be in compliance with all applicable governmental rules, regulations, and orders. It also had a duty to restore the property to the same or similar condition existing at commencement of the lease as nearly as practicable.

Unocal operated salt water disposal wells on the Sixteenth Section lands under both leases. Unocal's expert, Mr. Barnhill, testified as follows.

Q.  Let's talk about salt water disposal wells. You talked about quite a few documents, but I want to first right off the bat, you admit that the problems that Unocal experienced with number 12, the number 16 and some of the others, that those were serious problems, right?

38

A.    They were.

Q.    Breaching of water to the surface from a salt water disposal well is not the way it's supposed to work?

A.    It is not. You do not want the water to come up -- if it comes up, you would like it to come up inside the casing. But you certainly don't want it to come up outside the casing.

Q.    And we know, do we not, that it happened with the number 16 right here?

A.    Right. We know we had an issue with the 16.

Q.    It happened within the 12 as well, didn't it?

A.    It did. Now, on the 16, we know for a fact it got outside the conductor. The 12 doesn't tell us, but it may have.

Q.    It said water was communicated to the surface for both of these, right?

A.    It was.

Q.    For the number 16, the document said the water was channelling to the surface outside of the conductor pipe?

A.    It did.

Q.    It means totally outside of the well, right?

A.    It's outside of the well.

Q.    And contaminating the fresh water canal system?

A.    Well, it's going into the canal system. I think part of the debate is whether that's a fresh water system or not, but that's for somebody else to answer.

Q.    Well, the document itself, Let's pull up the document. The document itself for number 16 says it was a fresh water canal system, right?

A.    That's what whoever wrote that document said, yes.

Q.    Go to P-1794.002. "It was recently discovered that salt water is apparently escaping through a hole in the casing."

A.    The conductor casing.

39

Q. "And channelling to the surface outside of the conductor pipe contaminating the fresh water canal"?

A. Correct.

Q. You're not a marsh expert, you're not going to dispute whether he was correct about that or not?

A. No. Whoever wrote this said a fresh water canal. Whether that's true or not, somebody else will come talk to y'all about that.

Q. If that sort of things happens, do you think it's a good idea to report is to the Department of Natural Resources?

A. If you were actually releasing produced water into a fresh water system, then that -- you should report that, in my opinion, yes.

Q. You have to acknowledge it could have contaminated the fresh water supply, correct?

A. Depends on how much we're talking about, but there's that potential, yes.

The above excerpt from Barnhill states that salt water from a disposal well is not supposed to escape the conductor casing and that salt water did, in fact, escape conductor casings on at least two sites. While Barnhill deferred to other experts as to whether this saltwater damaged a nearby fresh-water canal, he clearly testified that the escape of this salt water violates state regulations. Thus, Unocal's failure to abide by state regulations dictates that it breached the 1994 Lease.

Despite this testimony, inexplicably, the jury verdict form regarding the 1994 Lease is as follows:

**BREACH OF CONTRACT—THE 1994 SURFACE LEASE**

7. As to each entity that had an interest in the 1994 Surface Lease, do you find that it operated unreasonably or excessively and/or violated the written terms of the lease?

    a. Union Oil Company of California        Yes ___        No __✓__

Again, as was the case with the 1935 Lease, this finding is in direct contradiction to the jury's findings in in questions 1, 2, and 3 that that Unocal did

40

contaminate the Sixteenth Section lands and in awarding remediation damages to VPSB under Act 312. As such, the jury verdict form and finding that Unocal did not breach the 1994 Lease is clearly wrong. Here, Barnhill, Unocal's expert, admits contamination exceeds State Regulations, and the jury found that $3,500.000.00 is needed to remediate the property up to State Regulations. Thus, it is clearly inconsistent for the jury to also find no breach of the leases by Unocal.

After the trial court read the jury's remaining answers to interrogatories aloud and polled the jury, Unocal's counsel stated, "Your Honor. We renew our motion that the Court accept the verdict of the jury as the judgment." The trial court then recorded the verdict.

Based on the above, we find that the jury's failure to find Unocal breached both the 1935 and 1994 Lease on the jury verdict form is clearly inconsistent with its finding of fact that Unocal contaminated the Sixteenth Section lands and with its awarding damages for restoration of that land. "When the answers [to jury interrogatories] are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court *shall not* direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial." La. Code Civ.P. Art. 1813(E) (emphasis added).

Despite the inconsistent answers by the jury, the trial court in the present case followed neither prescribed course but, rather, entered a judgment based on those inconsistent jury answers to interrogatories. This is legal error.

Louisiana Code of Civil Procedure Article 2164 which states, in pertinent part, "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." This court, in *Sweet Lake Land & Oil Company, LLC v. Oleum Operating Company, L.C.*, 16-429, p. 13 (La.App. 3 Cir. 3/8/17), __ So. 3d __, __, found the record to fall "woefully short of establishing with any measure of

41

reasonable certainty the amount of damages required to remediate the two areas at issue." Accordingly, the *Sweet Lake* court, citing La. Code Civ.P. art. 2164, remanded the case to gather more evidence and conduct further proceedings consistent with the opinion.

We are faced with a similar situation in the case *sub judice*. In *State v. La. Land & Explor. Co.*, 17-830 (La.App. 3 Cir. 3/14/18), 241 So.3d 1258, *writ denied*, 18-476 (La. 9/28/18), 252 So.3d 924, an earlier appeal, this court dealt with the issue of whether LDNR's plan was appropriately adopted by the trial court. Chief Judge Thibodeaux, dissenting, stated the following:

> [T]he final plan submitted to the trial court contains far too many contingencies with no estimate of the cost of the contingencies. In short, the LDNR plan was incomplete; it repeatedly described more work that had to be done before remediation would be complete, including at least two years of monitoring, but the trial court did not require cost estimates on the additional work. As a result, no one knows, or even has a good estimate of, how much it will take to remediate the land to the level required to protect the public; and no one knows how long it will take to finish the remediation.

*Id.*, at 1269. Thereafter, Chief Judge Thibodeaux went on to point out numerous issues with LDNR's adopted plan relative to its incompleteness or uncertainty. Our purpose of highlighting this dissent is not to relitigate the issue of the appropriateness of LDNR's adopted plan. Rather it is to show that there are issues within the record in this case that can reasonably be deemed incomplete.

VPSB, in Assignments of Error numbers seven and eight, asserts that the trial court erred in denying its requests for discovery of documents and witnesses, and motion for new trial based on newly discovered evidence. This alleged evidence was discovered after the trial in another pending matter against Unocal.

Further, VPSB raises several assignments of error alleging improper jury charges, improper jury instructions, improper denial of motions for JNOV and new trial, and, of note, assertions that discovery was not complete due to alleged Unocal

42

improprieties and evidence discovered after trial. While we are not opining as to the validity to any of the assertions by VPSB, given the length that this case has been pending, and the complexities of such, to rush to judgment now is not judicially prudent. Accordingly, we find that the proper course of action in this matter is to remand the case for a new trial with further proceedings consistent with this opinion.

## PLAINTIFFS' ASSIGNMENTS OF ERROR NUMBERS TWO THROUGH FOURTEEN

This court's finding that the jury verdict was inconsistent and the trial court erroneously entering judgment on that inconsistent verdict was legal error necessitating a new trial renders the plaintiffs' assignments of error number two through fourteen moot given that these assignments detailed allegations of improper denial of motions for additional discovery and/or a new trial, and for corrections of alleged errors by the trial court in instruction of the jury.

## CONCLUSION

We find that Sixteenth Section lands are a natural resource of this state and the school boards function as the state in the state's capacity of trustee for the benefit of public education. Further, due to classification of the Sixteenth Section lands and the relationship of the school board and state relative to those lands, we find that the La.Civ.Code art. 2317 action by the Vermilion Parish School Board is not subject to prescription under Article 12, § 13 of the Louisiana Constitution. Accordingly, we find no merit to Union Oil Company of California's two assignments of error alleging that the Vermilion Parish School Board had no cause of action and/or its claims for strict liability were prescribed.

Further, we find merit to the Vermilion Parish School Board's assigned error that the trial court committed legal error in entering judgment on an inconsistent jury verdict. Finally, we find that the most prudent course of action in this matter is to

43

remand the case for a new trial and proceedings consistent with this opinion.  Costs

are assessed to Union Oil Company of California.

**AFFIRMED, IN PART, REVERSED, IN PART, AND REMANDED.**